Billy NATIONS, Appellant,

v.

The STATE of Texas, Appellee.

No. 03–93–00428–CR.

Court of Appeals of Texas,
Austin.

May 1, 1997.

David L. Botsford, Law Office of David L. Botsford, Terrence W. Kirk, Austin, for Appellant.

Ronald Earle District Attorney, C. Bryan Case, Jr., Assistant District Attorney, Austin, for State.

Before ABOUSSIE, B.A. SMITH and DAVIS, JJ.*

## ON REMAND

BEA ANN SMITH, Justice.

Billy Nations appeals from his conviction for aggravated sexual assault. On original submission we rejected appellant's contention that the trial court erred in excluding expert testimony concerning the accuracy of eyewitness identification. *Nations v. State*, 894 S.W.2d 480 (Tex.App.—Austin 1995). On petition for discretionary review, the court of criminal appeals remanded the cause to our court with instructions that we reconsider this point of error in light of its recent opinion in *Jordan v. State*, 928 S.W.2d 550 (Tex. Crim.App.1996). *See Nations v. State*, 930 S.W.2d 98, 99 (Tex.Crim.App.1996).

### *Kelly and Daubert*

The admissibility of expert testimony is governed by Texas Rule of Criminal Evidence 702.[1] In *Kelly v. State*, 824 S.W.2d 568 (Tex.Crim.App.1992), the court of criminal appeals considered the admissibility of DNA genetic testing evidence. In determining admissibility under rule 702, the court rejected the test enunciated in *Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923), that novel scientific procedures must be *generally accepted in the scientific community* to be admissible. *Kelly*, 824 S.W.2d at 572. Instead, the court held that under rule 702, the threshold determination for the trial

---

* Tom G. Davis, Judge (retired), Court of Criminal Appeals, sitting by assignment. *See* Tex. Gov't Code Ann. § 74.003(b) (West 1988).

1. Texas Rule of Criminal Evidence 702 and Texas Rule of Civil Evidence 702 are identical to Federal Rule of Evidence 702:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

court is simply whether the testimony will help the trier of fact understand the evidence or determine a fact in issue. *Id.* When expert testimony is offered on a scientific topic unfamiliar to lay jurors, the trial court's task is to determine whether the testimony is sufficiently *reliable* and *relevant* to help the jury in reaching accurate results. *Id.* at 573. The court set forth three criteria of reliability that the proponent of novel scientific evidence must prove: (1) the underlying scientific theory must be valid; (2) the technique applying the theory must be valid; and (3) the technique must have been properly applied on the occasion in question. *Id.* The court went on to suggest a nonexclusive list of factors that might influence a finding of reliability: (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained; (2) the qualifications of the testifying expert; (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person who applied the technique on the occasion in question. *Id.*

▇▇ The burden of persuasion is on the proponent of the novel scientific evidence to demonstrate by clear and convincing evidence, outside the presence of the jury, that such testimony is reliable and therefore relevant; unreliable scientific evidence will not assist jurors to understand the evidence or accurately determine a fact in issue. *Id.* Even after the trustworthiness of the evidence has been established, the trial court must still determine if the probative value of the expert testimony is outweighed by the danger of confusion, prejudice, or any of the other considerations identified in rule 403. *Id.*

▇▇ Shortly after the *Kelly* decision governing admissibility of novel scientific evidence under Texas criminal rule 702, the United States Supreme Court formulated a similar test of admissibility under federal rule 702. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 590–92, 113 S.Ct. 2786, 2795–96, 125 L.Ed.2d 469 (1993). In *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549 (Tex.1995), the Texas Supreme Court adopted the *Daubert* and *Kelly* test for admissibility of scientific expert testimony in civil trials in this state. *Id.* at 556. As we have observed, federal rule 702 is identical to Texas rule 702 in both civil and criminal matters. We note that the greater admissibility of evidence promoted under the new rules of evidence was cited as the impetus for abandoning the *Frye* test: under rule 702 the trial court judge may admit *any* evidence that might be helpful to the trier of fact, whether or not it is generally accepted in the scientific community. *See Daubert,* 509 U.S. at 588–89, 113 S.Ct. at 2794–95; *Kelly,* 824 S.W.2d at 572. Rule 702 places the trial judge in the role of a "gatekeeper" who must ensure that scientific testimony is not only relevant, but reliable. *Daubert,* 509 U.S. at 589, 113 S.Ct. at 2794–95. The issue of reliability arises when expert testimony is offered on a scientific topic unfamiliar to lay jurors: "Unreliable ... scientific evidence simply will not assist the [jury] to understand the evidence or accurately determine a fact in issue; such evidence obfuscates rather than leads to an 'intelligent evaluation' of the facts." *Kelly,* 824 S.W.2d at 572 (quoting Kenneth R. Kreiling, *Scientific Evidence: Toward Providing the Lay Trier With the Comprehensible and Reliable Evidence Necessary to Meet the Goals of the Rules of Evidence,* 32 Ariz.L.Rev. 915, 941–42 (1990)). With this background, we turn to the court of criminal appeals' recent decision in *Jordan* and its application to the expert testimony excluded by the trial court in the cause before us.

### Jordan and "Relevance"

In *Jordan* the court of criminal appeals addressed the admissibility of expert testimony under rule 702 on the issue of eyewitness identification. The trial court ruled the expert's testimony was inadmissible because (1) it was not beyond the common knowledge of the jurors; (2) it would supplant the ju-

rors' role in weighing credibility; and (3) the same information could be brought out with effective cross-examination. The court of appeals affirmed on the ground that the expert's testimony was too general and did not fit the specific facts of the case. *Jordan v. State,* 877 S.W.2d 902, 905 (Tex.App.—Fort Worth 1994), *rev'd,* 928 S.W.2d 550 (Tex. Crim.App.1996) (citing *Rousseau v. State,* 855 S.W.2d 666 (Tex.Crim.App.), *cert. denied,* 510 U.S. 919, 114 S.Ct. 313, 126 L.Ed.2d 260 (1993), and *Pierce v. State,* 777 S.W.2d 399 (Tex.Crim.App.1989), *cert. denied,* 496 U.S. 912, 110 S.Ct. 2603, 110 L.Ed.2d 283 (1990)). The court of appeals noted the expert's failure to interview the witnesses or examine the photo lineup used in identifying the defendant: "[T]he failure of the expert to conduct a thorough, fact specific analysis of the eyewitness identifications adversely affected the value of the testimony to the jury.... " *Id.*

■ The court of criminal appeals addressed the intermediate appellate court's holding that the expert's testimony was inadmissible because it did not sufficiently "fit" the facts of the case. *Jordan,* 928 S.W.2d at 555. The expert did not interview the witnesses, did not examine the photo lineup, and did not address every factor that might have affected the reliability of the eyewitness's identification. *Id.* at 555–56. The court began by noting that consideration of whether the expert's testimony was sufficiently tied to the facts of the case impacted the *relevance* prong, not the reliability prong, of the trial court's inquiry:

> Relevance is by nature a looser notion than reliability. Whether evidence "will assist the trier of fact" and is sufficiently tied to the facts of the case is a simpler, more straight-forward matter to establish than whether the evidence is sufficiently grounded in science to be reliable.

*Id.* at 555. The court of criminal appeals went on to hold that an expert need not testify as to "every conceivable factor" that might affect the reliability of eyewitness identification in order to be helpful to the jury. *Id.* at 556. The testimony is admissible if the expert "took into account *enough* of the pertinent facts to be of assistance to the trier of fact on a fact in issue." *Id.*

The court rejected the State's argument that expert testimony on the reliability of eyewitness testimony is not helpful because this is a matter within the common knowledge of jurors. *Id.* The court held that jurors' notions about the reliability of eyewitness testimony might nevertheless be aided by the studies and findings of trained psychologists on the issue:

> If a juror's "gut" or common sense beliefs about certain factors were to be called into question by Finn's testimony on the issue, the juror would be prompted to reconsider preconceived notions that he might otherwise have been unaware of when reviewing the facts of the case. On the other hand, if a juror's preconceived notions were confirmed by Finn's testimony on the issue, the juror could proceed with greater confidence on that issue.

*Id.*

■ In the present case, the most highly contested issue was the victim's identification of her assailant. After reviewing a six-photograph lineup, the victim first said that one photo *could be* the man who raped her; when the officer conducting the lineup asked what she meant, she responded that she *thought* it was him. When the officer asked again, "Are you *sure* that is him?" the victim answered she was.

In a hearing outside the presence of the jury, Dr. Caren Phelan testified that she is a psychologist who has done a great deal of research on the nature of memory, in particular the impact of post-traumatic stress on the accuracy of memory. She received her Ph.D. in psychology from the University of Maryland, followed by post-doctoral work in neuropsychology on the nature of memory. She trained for two years at the Menninger clinic, and received additional training in New York and in Washington, D.C.

Dr. Phelan testified that the evaluation of a person's ability to recount events witnessed in person is a recognized field of psychology. Dr. Phelan has trained with some of the leading experts in the field of memory, including Dr. Elizabeth Loftus, a nationally recognized expert on the acquisition, storing, retrieval, and verbalization of memory. Dr.

Phelan indicated that she would testify to some of the pitfalls of identification by eye-witnesses. Although she had not interviewed the victim, she proposed to offer testimony in response to hypothetical questions that reflected the facts of this case. In particular she said she would testify that when given a chance to respond more than once to an inquiry about identification, the respondent's first response ("that could be him") is probably the most accurate, while subsequent responses ("I'm sure it was him") could be influenced by the respondent's desire for certainty or by an unconscious desire to give her questioners the answer they want to hear. She also proposed to testify that a blow to the head, as this victim suffered during her attack, or the fear and trauma associated with being raped, could also affect the accuracy of the victim's memory. Dr. Phelan testified that due to her training and study she thought she had more knowledge about the way the human memory works and about the reliability of eyewitness identification than the average juror.

The State objected to the relevance of the testimony on the ground that it would be of no assistance to the jury. Relying on *Pierce v. State,* 777 S.W.2d 399 (Tex.Crim.App. 1989), *cert. denied,* 496 U.S. 912, 110 S.Ct. 2603, 110 L.Ed.2d 283 (1990), the trial court sustained the objection. In *Pierce,* the court of criminal appeals upheld the exclusion of expert testimony on eyewitness identification, mentioning the jurors' ability to determine credibility without the assistance of expert testimony, and noting the expert's failure to tailor his testimony to fit the specific facts of the case. Without discussing whether Dr. Phelan's testimony "fit" the specific facts, this Court held on appeal that the trial court correctly determined that her testimony would not be helpful because the nature of memory is within the common knowledge of jurors.

> The jury was amply qualified to make a determination of the reliability of the victim's identification of appellant in light of extensive cross-examination of the victim and the jury's inherent knowledge of memory and its effect on perception.

*Nations,* 894 S.W.2d at 485.

■ *Jordan* now instructs us that this is an improper basis for excluding expert testimony on the reliability of eyewitness testimony.

> While jurors might have their own notions about the reliability of eyewitness identification, that does not mean they would not be aided by the studies and findings of trained psychologists on the issue.

*Jordan,* 928 S.W.2d at 556. *Jordan* also teaches us that the expert testimony need not address every foreseeable issue raised by the relevant facts; it passes the relevancy test under rule 702 if it is "sufficiently tied to the facts" to be helpful to the jury. We hold that the hypothetical questions Dr. Phelan proposed to answer were sufficiently tied to the pertinent facts of this case to be helpful to the jury. Indeed, the factors considered by Dr. Phelan furnish a stronger "fit" than those considered relevant in *Jordan.* Accordingly, we reverse our prior ruling and hold that the expert testimony proffered by Dr. Phelan was relevant under rule 702.

### *"Reliability"*

■ On remand, but not before, the State argues that Dr. Phelan's testimony was properly excluded because it does not meet the reliability prong of rule 702. We reject this argument. We first note that the State did not object at trial to Dr. Phelan's testimony on the ground that it was unreliable. The only objection voiced was that the testimony was not relevant because it would not assist the trier of fact. This objection was insufficient to apprise the trial court or defense counsel that the State was challenging the scientific validity of the evidence proffered. *See* Tex.R.App.P. 52(a); Tex.R.Crim.Evid. 103(a)(1). On appeal, the State argued simply that Dr. Phelan's testimony did not fit the facts of the case. We hold that the State has waived any complaint about the reliability of Dr. Phelan's testimony.

Furthermore, we are not convinced under the current law in this state interpreting rule 702 that it is appropriate to conduct a hearing on the reliability of evidence from the field of psychology. Neither the court of criminal appeals nor the supreme court has specifically addressed the question of wheth-

er a reliability inquiry is applicable to a social science such as psychology. *Kelly* involved the admissibility of DNA testing, a classic example of "novel" scientific knowledge. The court of criminal appeals has recently held that *Kelly* applies to all scientific evidence, not merely *novel* scientific evidence. *Hartman v. State,* 946 S.W.2d 60 (Tex.Crim. App. 1997). *Robinson,* like *Daubert,* involved an attempt to establish causation in a tort case based upon scientific epidemiological studies establishing a statistical relationship between an agent and a condition. *Daubert* and the Texas opinions discuss only the admissibility of "*scientific* expert testimony." Rule 702 addresses the admissibility of "scientific, technical, or *other specialized knowledge.*" In the wake of *Daubert,* some courts have allowed scientific knowledge to swallow up the other categories of expert testimony referenced in rule 702, subjecting all expert opinions to a *Daubert* screening for scientific validity. Many commentators would distinguish the types of expert testimony and subject them to different screening under rule 702: "Expert testimony is really a spectrum, with specialized knowledge at one end and science at the other." Teresa S. Renaker, Comment, *Evidentiary Legerdemain: Deciding When* Daubert *Should Apply to Social Science Evidence,* 84 Cal.L.Rev. 1657, 1682 (1996) ("*Evidentiary Legerdemain* ") (expert opinion based on specialized knowledge need only be helpful to the trier of fact, while expert testimony based on scientific knowledge must be helpful *and* scientifically valid). There are strong arguments against extending the gatekeeping role of the trial judge to screen evidence from the soft sciences for reliability. Among other problems, the criteria used to evaluate scientific testimony cannot be properly applied to fields of expertise which are not based on the scientific method, the process of retesting scientific hypotheses by duplicating the original experimental conditions. *See generally Confronting the New Challenges of Scientific Evidence,* 108 Harv.L.Rev. 1481, 1523–27

(May 1995) (discussing the difficulties in accurately assessing the reliability of psychological testimony).[2]

Many commentators have urged courts to restrict *Daubert* 's reliability prong to purely scientific knowledge and to assess all other expert testimony only for helpfulness to the trier of fact, without evaluating the underlying theory and methodology. *See, e.g.,* Lisa M. Agrimonti, *The Limitations of Daubert and its Misapplication to Quasi–Scientific Experts, A Two Year Case Review of Daubert v. Merrell Dow Pharmaceuticals,* 35 Washburn L.J. 134, 147 (1995). Other commentators recognize the difficulty of applying the *Daubert* criteria to nonscientific areas like psychology, engineering, or accounting and advocate adapting the factors to better fit nonscientific evidence. *See* Edward J. Imwinkelried, *The Next Step After* Daubert: *Developing A Similarly Epistemological Approach to Ensuring the Reliability of Nonscientific Expert Testimony,* 15 Cardozo L.Rev. 2271, 2283–85 (1994).

In order to qualify as scientific knowledge, an inference or assertion must be derived by the scientific method and must be supported by appropriate validation. *Daubert,* 509 U.S. at 590, 113 S.Ct. at 2795. Although most experts clothe their opinions in the language of science, many fields of expertise are not based on the scientific method and many types of expert opinion not subject to empirical verification may nevertheless assist the trier of fact. While not scientific, this specialized knowledge offers subjective observations and comparisons based on the expert's training, skill, or experience that may be helpful to the jury in understanding or determining the facts. To distinguish between science and other specialized knowledge, the trial court might look to the purpose for which the evidence is introduced. The author of *Evidentiary Legerdemain* suggests that testimony that posits an explanatory theory to draw a conclusion

---

2. In *Gier v. Educational Service Unit No. 16,* 66 F.3d 940 (8th Cir.1995), the court of appeals affirmed the trial court's severe limitation of the testimony of three psychiatric experts who had evaluated mentally retarded students, holding that the testimony was unreliable under *Dau-*

*bert* 's "testability" factors. *Id.* at 944; *see also State v. Foret,* 628 So.2d 1116, 1127 (La.1993) (psychological syndrome theories are essentially untestable and fail *Daubert'* s threshold test of scientific reliability).

or determine causation would need to be empirically verifiable, while testimony that certain symptoms or phenomena are similar to those observed by the expert may be helpful to the trier of fact even though it is not externally verifiable. *See Evidentiary Legerdemain, supra*, at 1684–92. For example, testimony regarding eyewitness identification that does not assess the truthfulness of a particular witness may be helpful to the jury without being scientifically verifiable. *See United States v. Starzecpyzel*, 880 F.Supp. 1027, 1045 (S.D.N.Y.1995) (applying this distinction to testimony concerning handwriting identification). Psychology, especially opinions regarding psychological syndromes and problems with eyewitness identification, may fall more in the category of specialized knowledge, rather than scientific knowledge. "[M]ost jurors do not conceive of psychological research as very, if at all, 'scientific.' It is not likely to elicit unquestioning juror acceptance." David McCord, *Syndrome, Profiles and Other Mental Exotica: A New Approach to the Admissibility of Nontraditional Psychological Evidence in Criminal Cases*, 66 Or. L.Rev. 19, 85–86 (1987).

In *Forte v. State*, 935 S.W.2d 172 (Tex. App.—Fort Worth 1996, no pet. hist.), the intermediate court applied the seven *Kelly* factors to find that expert testimony on eyewitness identification similar to that given in this case was not reliable. We think that opinion aptly demonstrates that a rigid application of the *Kelly* criteria might exclude relevant and reliable expert testimony. That anomaly explains our reluctance to measure the reliability of testimony regarding eyewitness identification or other psychological testimony without further guidance from the higher courts of this state. If specialized knowledge will be admissible when helpful to the trier of fact under rule 702, whether or not it can be scientifically validated, we must also develop guidelines for distinguishing such specialized knowledge from scientific knowledge that must be validated.

In an abundance of caution, should we be wrong in holding that the State's complaint about reliability was not preserved, and should the court of criminal appeals' decision in *Jordan* be interpreted to apply *Kelly* to nonscientific evidence such as the field of psychology, we would conclude that on this record Dr. Phelan's testimony sufficiently complies with the *Kelly* criteria to be held reliable. We are reluctant to hold that a trial court abused its discretion in excluding expert testimony. But had the State asked the trial court to assess the reliability of Dr. Phelan's testimony, we hold it would be an abuse of discretion to exclude that testimony as unreliable on the record presented here. In our earlier discussion regarding relevance, we have outlined Dr. Phelan's qualifications and her training with Dr. Elizabeth Loftus. Dr. Phelan pointed to peer literature evaluating the theories advanced by Dr. Loftus and stated that memory is a generally recognized field of study in psychology. The Fifth Circuit has approved admission of expert testimony offered by Dr. Loftus on the weaknesses of eyewitness identification. *See United States v. Moore*, 786 F.2d 1308, 1312 (5th Cir.1986). The Arizona Supreme Court has recognized the eminence of Dr. Loftus in the field of memory, stating that "she wrote the book" on the subject. *State v. Chapple*, 135 Ariz. 281, 660 P.2d 1208, 1218 (1983). The Third Circuit found expert testimony on eyewitness identification similar to Dr. Phelan's reliable under rule 702. *See United States v. Downing*, 753 F.2d 1224, 1241–42 (3rd Cir.1985). Dr. Phelan testified that she had done a great deal of research on memory in connection with evaluating and treating children and adults who had been sexually abused. Dr. Phelan demonstrated sufficient clarity in explaining her theories to the court in the hearing outside the presence of the jury. Although there was no discussion of the potential rate of error,[3] the other six factors were sufficiently satisfied that we believe the proponent met his burden of establishing the admissibility of this expert's testimony.

---

**3.** This is the kind of factor that cannot be readily applied to nonscientific fields such as psychology.

 We hold that the trial court erred in excluding Dr. Phelan's testimony under rule 702, whether it was excluded because it was not relevant or because it was not reliable. Where error is revealed, the appellate court should not reverse the judgment unless it shall determine beyond a reasonable doubt that the exclusion of evidence made no contribution to the conviction or to the punishment. Tex.R.App.P. 81(b)(2). The pivotal defensive issue was the victim's misidentification of appellant as her offender. The proffered testimony of Dr. Phelan challenged the reliability of this victim's identification of this defendant under these specific circumstances. We are unable to determine beyond a reasonable doubt that the error made no contribution to the conviction. We sustain the first point of error.

## CONCLUSION

We reverse the judgment of conviction and remand the cause for a new trial.