**UNITED STATES of America, Plaintiff,**

v.

**Larry D. HALL, Defendant.**

No. 94–20036.

United States District Court,
C.D. Illinois,
Peoria Division.

Aug. 13, 1997.

Richard H. Parsons, Federal Public Defender, Peoria, IL, Craig H. DeArmond, Kurth & DeArmond, Danville, IL, for Larry D. Hall.

Lawrence S. Beaumont, Asst. U.S. Atty., Urbana, IL, for U.S.

## *ORDER*

McDADE, District Judge.

Before the Court is the Government's Motion to Preclude Dr. Ofshe's Testimony at Trial [Doc. # 164]. Dr. Richard Ofshe is a social psychologist operating in the field of coercive police interrogation techniques and the phenomenon of false or coerced confessions. He is prepared to testify that experts in his field agree that false confessions exist, that individuals can be coerced into giving false confessions, and that there exist identifiable coercive police interrogation techniques which are likely to produce false confessions.

At Defendant's first trial, the district court rejected Dr. Ofshe's proffered testimony under Fed.R.Evid. 702. However, in *United States v. Hall,* 93 F.3d 1337, 1344–45 (7th Cir.1996), the Seventh Circuit vacated Defendant's conviction and remanded the case to this Court to correct the prior court's "failure to conduct a full *Daubert* inquiry, applying the correct legal standards under Rule 702." Pursuant to this directive, the Court held an extensive Rule 104(a) hearing to determine the admissibility of Dr. Ofshe's expert testimony.

The Government postulates that Defendant must show a scientific basis for Dr. Ofshe's expert opinion because it is based upon "scientific [ ] knowledge" under Rule 702. Conversely, Defendant contends that Dr. Ofshe's expert testimony is derived from a body of "specialized knowledge" under Rule 702 whose validity should not be analyzed under the *Daubert* standard. This case raises a rather perplexing question: to what extent, if any, does *Daubert* apply to "soft" sciences such as social psychology?

### *Scientific v. Specialized Knowledge*

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 581, 113 S.Ct. 2786, 2791, 125 L.Ed.2d 469 (1993), the Supreme Court determined the proper standard "for admitting expert scientific testimony in a federal trial." The Court rejected the *Frye*

"general acceptance" test for the more liberal standard embodied in Fed.R.Evid. 702 that the expert need only testify to "(1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592, 113 S.Ct. at 2796. The Court stated that in order to "qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method." *Id.* at 590, 113 S.Ct. at 2795. The Court noted four nonexhaustive factors that would bear on this inquiry: falsifiability, peer review, rate of error and general acceptance. *Id.* at 593–94, 113 S.Ct. at 2796–97.

Rule 702, however, speaks not only of "scientific" knowledge but also of "technical, or other specialized knowledge" as alternative bases for an expert's opinion. The Court in *Daubert* was careful to point out that its discussion did not reach "technical" or "specialized" knowledge under the Rule. *Id.* at 590 n. 8, 113 S.Ct. at 2795 n. 8. Chief Justice Rehnquist's partial dissent noted the problem:

> Does all of this dicta [regarding the four factors] apply to an expert seeking to testify on the basis of "technical or other specialized knowledge"—the other types of expert knowledge to which Rule 702 applies—or are the "general observations" limited only to "scientific knowledge"? What is the difference between scientific knowledge and technical knowledge; does Rule 702 actually contemplate that the phrase "scientific, technical, or other specialized knowledge" be broken down into numerous subspecies of expertise, or did its authors simply pick general descriptive language covering the sort of expert testimony which courts have customarily received?

*Id.* at 600, 113 S.Ct. at 2800 (Rehnquist, J., concurring in part and dissenting in part).

Fortunately, four years have passed since the *Daubert* decision and there is both academic literature and case authority to guide the Court. Two conflicting views have been espoused. The first argues that Rule 702's reference to "technical, or other specialized knowledge" does not give courts or litigants an opportunity to circumvent the strict requirements of the scientific method as espoused in *Daubert*. Rather, "Rule 702 contemplates a fluid analysis, with a preference

for scientific knowledge when it is or should be available." David L. Faigman, *The Evidentiary Status of Social Science Under Daubert: Is It "Scientific," "Technical," Or "Other" Knowledge?*, 1 Psychol. Pub. Pol'y & L. 960, 979 (1995). Under this view, the *Daubert* test should be applied to all three types of knowledge specified in Rule 702. *Id.* at 964. The reference to "technical, or other specialized knowledge" merely "relaxes the requirement for a scientific demonstration when a less rigorous, less time-consuming, and less expensive alternative would provide sufficiently accurate information." Thus, for example, a mechanic can testify about his practical knowledge of carburetors without requiring his conclusions to be deduced from the scientific method. *Id.* at 964. However, the fact that a topic may be too complex for experimental analysis does not justify relaxing the standards of Rule 702 and ignoring *Daubert*. *Id.* at 963–64, 979.

The second, and in the Court's opinion, the better view, is that testimony which is simply not amenable to the scientific method should not be subjected to the strictures of *Daubert* and instead can pass as "specialized knowledge." See Jennifer Laser, *Inconsistent Gatekeeping in Federal Courts: Application of Daubert v. Merrell Dow Pharmaceuticals, Inc. to Nonscientific Expert Testimony*, 30 Loy. L.A. L.Rev. 1379 (1997); Teresa S. Renaker, *Evidentiary Legerdemain: Deciding When Daubert Should Apply to Social Science Evidence*, 84 Cal. L.Rev. 1657 (1996); Edward J. Imwinkelried, *The Next Step After Daubert: Developing a Similarly Epistemological Approach to Ensuring the Reliability of Nonscientific Expert Testimony*, 15 Cardozo L.Rev. 2271 (1994).

These commentators distinguish between those experts who practice Newtonian science, which utilizes the experimental method to validate or disprove hypotheses, and those who acquire their knowledge by formal instruction, experience or observation. The Court in Daubert dealt expressly with Newtonian experimental science when it articulated such considerations as whether the hypothesis is testable (falsifiability), whether it in fact had been tested (peer review), and whether there was a known error rate.

*Daubert,* 509 U.S. at 593–94, 113 S.Ct. at 2796–97. These concerns have little or no application to nonscientific expert evidence. The Sixth Circuit has noted that application of these factors to nonscientific evidence would "turn *Daubert,* a case intended to relax the admissibility requirements for expert scientific evidence, on its head." *United States v. Jones,* 107 F.3d 1147, 1157–58 (6th Cir.), cert. *denied,* — U.S. —, 117 S.Ct. 2527, 138 L.Ed.2d 1027 (1997).

One way to distinguish between "hard" scientific testimony and "other specialized knowledge" is to look to the purpose for which the evidence is being introduced. If the testimony posits an explanatory theory to draw a conclusion or determine causation in a particular case, this would normally require experimental verification, the focal point of Newtonian science. Conversely, if the testimony involves a simple correlational study between different factors or events, without attempting to determine causation, there is no need for experimental verification and it can be classified as specialized knowledge. *See Nations v.* State, 944 S.W.2d 795, 800–01 (Tex.Ct.App.-Austin 1997); Renaker, *Evidentiary Legerdemain,* 84 Cal. L.Rev. at 1686–91.

Another distinguishing factor is whether such knowledge can be derived from experience or training as opposed to controlled experimentation. The analogy in *Berry v. City of Detroit,* 25 F.3d 1342, 1349–50 (6th Cir.1994), is particularly apt:

The distinction between scientific and nonscientific expert testimony is a critical one. By way of illustration, if one wanted to explain to a jury how a bumblebee is able to fly, an aeronautical engineer might be a helpful witness. Since flight principles have some universality, the expert could apply general principles to the case of the bumblebee. Conceivably, even if he had never seen a bumblebee, he still would be qualified to testify, as long as he was familiar with its component parts.

On the other hand, if one wanted to prove that bumblebees always take off into the wind, a beekeeper with no scientific train-

ing at all would be an acceptable expert witness if a proper foundation were laid for his conclusions. The foundation would not relate. to his formal training, but to his firsthand observations. In other words, the beekeeper does not know any more about flight principles than the jurors, but he has seen a lot more bumblebees than they have.

*See also* Faigman, *The Evidentiary Status of Social Science,* 1 Psychol. Pub. Pol'y & L. at 964. While these distinctions may in time prove to be overly simplistic, they are a sufficient starting point for the Court's analysis here.

A number of courts have recognized these distinctions and have refused to apply the four factors specified in *Daubert* to expert testimony which is not easily subjected to the experimental method of the "hard" sciences. *See, e.g., Jones,* 107 F.3d at 1157–58 (handwriting analysis); *Tyus v. Urban Search Mgmt.,* 102 F.3d 256, 263–64 (7th Cir.1996), cert. *denied,* — U.S. —, 117 S.Ct. 2409, 138 L.Ed.2d 175 (U.S.1997) (impact of advertisements upon viewers of different races); *Roback v. V.I.P. Transp. Inc.,* 90 F.3d 1207, 1215–16 (7th Cir.1996) (measurement of truck performance taken by expert's self-designed equipment); *United States v. Williams,* 81 F.3d 1434, 1441–42 (7th Cir. 1996) (translation of gang code); *United States v. Sinclair,* 74 F.3d 753, 757 (7th Cir.1996) (legal expert); *United States v. Velasquez,* 64 F.3d 844, 850 (3d Cir.1995) (applying *Daubert* to handwriting analysis only as "an exercise in caution"); *Iacobelli Constr., Inc. v. County of Monroe,* 32 F.3d 19, 25 (2d Cir.1994) (geotechnical and underground construction experts); *Waitek v. Dalkon Shield Claimants Trust,* 934 F.Supp. 1068, 1087 n. 10 (N.D.Iowa 1996) (medical testimony about problems with contraceptive device), *aff'd,* 114 F.3d 117 (8th Cir.1997) (per curiam); *United States v. Starzecpyzel,* 880 F.Supp. 1027, 1039–41 (*S.D.N.Y.* 1995) (handwriting analysis); *Nations,* 944 S.W.2d at 800–01 (eyewitness identifications).[1]

---

1. *But see Deimer v. Cincinnati Sub–Zero Prods., Inc.,* 58 F.3d 341, 344–45 (7th Cir.1995) (applying *Daubert* to proposed negligence causation expert); *O'Conner v. Commonwealth Edison Co.,*

13 F.3d 1090, 1105–07 (7th Cir.1994) (applying *Daubert* to physician's testimony that patient's cataracts were caused by radiation).

This is not to say, however, that *Daubert* is wholly inapplicable to non-Newtonian scientific testimony. Indeed, the Seventh Circuit has expressly held that "the *Daubert* framework is appropriate for all kinds of expert testimony." *Tyus*, 102 F.3d at 263; *American Int'l Adjustment Co. v. Galvin*, 86 F.3d 1455, 1465 (7th Cir.1996) (Posner, J., dissenting). Thus, for instance, the Seventh Circuit has applied *Daubert* to a psychologist's testimony on the impact of advertisements upon viewers of different races, *Tyus*, 102 F.3d at 263–64, an expert on measuring truck performance, *Roback*, 90 F.3d at 1215, a cardiologist's testimony about the nicotine patch causing a patient's heart attack, *Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316, 318–19 (7th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 73, 136 L.Ed.2d 33 (1996), and an accountant's testimony about generally accepted auditing standards. *Frymire–Brinati v. KPMG Peat Marwick*, 2 F.3d 183, 186–87 (7th Cir.1993).[2]

However, *Daubert* is only applicable to these cases in the general sense that all expert testimony must be subjected to the strictures of Rule 702 "to be sure that the person possesses genuine expertise in a field and that her court testimony 'adheres to the same standards for intellectual rigor that are demanded in [her] professional work.'" *Tyus*, 102 F.3d at 263 quoting *Braun v. Lorillard Inc.*, 84 F.3d 230, 234 (7th Cir.); *cert. denied*, —— U.S. ——, 117 S.Ct. 480, 136 L.Ed.2d 375 (1996). Thus, the measure of intellectual rigor will vary by the field of expertise and by the way in which such expertise can be demonstrated. *Id.*

 To sum up, the four factors laid out in *Daubert* must be applied when an expert bases his testimony on scientific hypotheses which are capable of being refuted by controlled experimentation. However, these factors may be applied in differing degrees when it comes to non-Newtonian science or

"other specialized knowledge." Fed.R.Evid. 702. The only thing that remains constant for all forms of expert testimony is that there must be some degree of reliability of the expert and the methods by which he has arrived at his conclusions. This criterion for admissibility derives from Rule 702 itself as well as the implications of the *Daubert* opinion. *Jones*, 107 F.3d at 1156.

### Application of Daubert to the Social Sciences

At this broad level of generality, *Daubert's* framework applies to the social sciences. *Tyus*, 102 F.3d at 263. Yet, the question remains, how reliable must social science evidence be before it is admissible as "specialized knowledge" under Rule 702? Moreover, even if the body of specialized knowledge is reliable, what qualifies this particular expert to testify about it? *Id.; Hall*, 93 F.3d at 1342–43.

To answer the first question, the Court must look to the particular field of social science at issue and determine the reliability of the methods by which scientists[3] in that field make their findings. Many social scientists rely primarily on real-world experience rather than experimentation to arrive at their conclusions.[4] Imwinkelried, The Next Step After Daubert, 15 Cardozo L.Rev. at 2289. Such experiences might be personal or vicarious. *Id.* However, certain quantitative and qualitative requirements must be placed upon those experiences before they can rise to the level of reliable specialized knowledge. There must be a threshold number of experiences from which the expert's knowledge is drawn. *Id.* at 2290–92. In addition, those experiences must be sufficiently similar in nature to form a valid basis for comparison. *Id.* at 2292–94.

---

2. In *Williams*, 81 F.3d at 1441–42, and *Sinclair*, 74 F.3d at 757–58, the Seventh Circuit rejected the application of *Daubert* altogether. This seeming inconsistency may be explained by the fact that the proffered experts in those cases relied entirely upon their personal experience and training and did not purport to be practicing any sort of systematic analysis. *Williams* involved an expert in gang language and *Sinclair* involved a legal expert.

3. The Court uses the terms "scientist" and "science" in the non-Newtonian sense here, for these words cannot be so narrowly confined.

4. One major reason for this is the ethical implications of experimenting on human beings. Another is the inherent complexity of isolating human behavioral characteristics in the laboratory setting.

The primary method for analyzing and comparing real-world experiences is systematic observation and analysis. Like the bumblebee analogy set forth in *Berry*, 25 F.3d at 1349-50, social scientists testify from a practical standpoint about the human behavior they observe. Unlike the beekeeper however, social scientists write scholarly articles about their observations which are subjected to peer review by others in their profession. This process of sharing one's findings with peers and having it critiqued by them may eventually lead to a common body of knowledge worthy of being called a "science," albeit not a "hard" science. such as physics.

■ In any field of social science, an expert should have to testify, at a minimum, to the longevity of that particular field, the amount of literature written about the subject, the methods of peer review among its scholarly journals, the quantity of observational or other studies conducted in that field, the comparative similarity of observations obtained, the reasons why those studies are deemed valid and reliable, and the general consensus or debate as to what the raw data means. In addition, the particular expert who wishes to testify must establish that he is sufficiently familiar with the topics mentioned above to render an informed opinion about them. It would also be helpful, but not necessary, to show that the proposed expert personally contributed to the field about which he is testifying, either through personal observation or by publication of an article, book or treatise on the subject.

Admittedly, this list is not exhaustive, but it is a starting point. Hopefully, the federal courts will be able to develop a more accurate understanding of how social science data should be analyzed under Rule 702. Until that time comes, the Court will have to satisfy itself with the general factors noted above to make an informed judgment about the reliability of the social science testimony being offered.

### Admissibility of False Confession Expert Testimony

■ Dr. Ofshe has been proffered by Defendant as an expert on false confessions and the factors which allow them to occur. He has a doctoral degree in social psychological from Stanford University and has taught psychological research methods at the University of California at Berkeley. He has received a number of prestigious honors in his field. He also serves on the editorial boards of numerous publications dealing with sociology and social psychology and has engaged in peer reviews of such articles. In addition, he has served as a consultant on the issue of influence in interrogations for federal and state law enforcement agencies across the country.

Throughout his 35-year academic career, Dr. Ofshe has researched the subject of influence and decision-making. For the past 25 years, he has focused on extreme forms of influence, such as coercion, and for the past 10 years, he has dealt specifically with the use of coercion in police interrogations. He has also written numerous articles on these topics and presented papers at the meetings of various scientific associations. He has personally evaluated at least 126 separate interrogations and has testified about the subject of influence in interrogation at least 68 times in state and federal courts throughout the country.

At the Rule 104(a) hearing, Dr. Ofshe testified at length about the development of the study of false confessions within the field of social psychology. He testified that social psychology is a hybrid between sociology and psychology, with some influence drawn from modern economic theory. The use of coercive techniques in interrogation is an established topic within the field of social psychology and draws on principles of rational decision making, perception and interpersonal influence. As an example of how vast the studies of this particular topic have been, Dr. Ofshe cited to Professor Gisli H. Gudjonsson's textbook entitled, "The Psychology of Interrogations, Confessions and Testimony" (Def.Ex. # 7) which references between 900 and 1,000 separate articles on the subject. Defendant also introduced into evidence over thirty separate articles and formal presentations about false confessions.

According to Dr. Ofshe, the study of false confessions generally involves the systematic observation of real-world interrogations. This is a method generally accepted as reliable by the community of social psychologists

in this field. The researcher initially obtains documented cases in which an innocent person has confessed to the crime. For instance, the researcher may look at cases in which another person subsequently confesses and is convicted of the crime or in which it is revealed, through DNA evidence or otherwise, that the defendant could not have committed the crime. Dr. Ofshe hypothesizes, and his peers appear to agree, that the major analytical method for determining the existence of a false confession is the post-admission narrative statement. In this technique, the confessor is asked about the details of the crime about which he has just confessed. If he relates facts that only the murderer would know, he must be guilty. If he relates facts inconsistent with the evidence at the crime scene, he is probably confessing falsely.

Once it is established through a post-admission narrative statement that a false confession has occurred, the researcher then analyzes the interrogation process, either by reviewing it on audio or videotape or by having the parties recall the details of the interrogation. Documented factors are systematically analyzed to see whether they correlate with the existence of a false confession. Dr. Ofshe testified that no one factor or combination of factors could guarantee a false confession but that some factors might heighten the likelihood of one. While a number of factors were present in both true and false confession cases, a major distinguishing factor for false confessions is the interrogator's continued use of coercion either through false accusations or false promises of leniency. The idea is that a guilty person will more likely "crack" under the pressure or make a rational decision to choose the more lenient option sooner than an innocent person would.

In analyzing this type of data, some researchers have utilized statistical correlational techniques whereby they divide individuals by their personality traits or by their intelligence and then demonstrate the probability of those subjects complying with the interrogator. This is not an experimental method because the researcher does not manipulate the variables. Rather, it involves the use of observation and systematic analysis of persons with different traits.

Dr. Ofshe also testified that low-level laboratory experimentation has been conducted in this field. However, he admits that these experiments alone are not sufficiently reliable to support his findings. Even Professor Saul M. Kassin, who conducted many of these experiments, points out that various factors may have skewed the results, such as the use of college students as subjects (Govt. Ex. # 2, at 249–50) and the nature of the acts involved (Def. Ex. # 19, at 127). Professor Kassin even goes so far as to admit that "the current empirical foundation may be too meager to support recommendations for reform or qualify as a subject of 'scientific knowledge' according to the criteria recently articulated by the U.S. Supreme Court" in *Daubert.* (Govt. Ex. # 1, at 231).

Dr. Ofshe explained that the reason no laboratory studies could be conducted in real life situations is that it would be unethical. He stated that "people think of experiments as the be all and end all of science . . . That is simply not the case. And the entire social science enterprise is based on the use of a variety of different methods, that's so fundamental, and.. I'm simply saying that . . . given the problems that arise in doing particularly social science research, we cannot do the things to people that we can even do to animals." He concluded that "observation in the organization of reliable, of regular phenomenon is fundamental to the whole social science enterprise."

Dr. Ofshe testified that the studies based upon observational data are subjected to a process of peer review within the social psychologist community. Authors generally respond to the criticisms of their peers before actually publishing the paper. He further testified that there is no dispute in the scientific community that false confessions do exist and that studying things such as coercion and the post-admission narrative statement is the proper method of analyzing whether and why they occur.

The Government's witness, Dr. Frank Horvath, who has a doctoral degree in criminal justice and criminology, claims that there is no scientific basis for the use of the post-admission narrative statement as a method by which to determine the falsity of a confes-

sion. However, it is only common sense that a person who does not give accurate information about the crime may in fact not be guilty of that crime. While such a person may simply be withholding evidence or purposely giving false details, this risk does not destroy the validity of the original hypothesis that more likely than not, the person is innocent. The Court does not require a separate scientific basis for the use of post-admission narrative statements, which is only a technique by which social psychologists in this field gather their data.

Dr. Ofshe discussed his reluctance to state an ultimate opinion in the courtroom as to whether a false confession has actually occurred in any particular case. He would rather indicate to the jury the possibility of such a confession given the factors which have been systematically correlated to the existence of a false confession. Such restraint in the area of causation increases the reliability of Dr. Ofshe's testimony.

In light of this testimony, the Court finds that Dr. Ofshe is qualified as an expert in the field of coercive police interrogation techniques which may lead to false confessions. The Court further finds that the science of social psychology, and specifically the field involving the use of coercion in interrogations, is sufficiently developed in its methods to constitute a reliable body of specialized knowledge under Rule 702. While Dr. Ofshe and his peers utilize observational, as opposed to experimental, techniques, this is wholly acceptable in the established field of social psychology.[5]

■ The Court cautions Defendant, however, that it will hold Dr. Ofshe to his word that he will only testify to the correlation between false confessions and the various factors espoused by him. Thus, he can testify that false confessions do exist, that they are associated with the use of certain police interrogation techniques, and that certain of those techniques were used in Hall's interrogation in this case. Dr. Ofshe cannot explicitly testify about matters of causation, specifically, whether the interrogation methods used in this case caused Hall to falsely con-

fess. Without experimental verification, such testimony would be speculative and prejudicial. Dr. Ofshe will simply provide the framework which the jury can use to arrive at its own conclusions.

Just as important, Dr. Ofshe cannot testify about the specifics of the post-admission narrative statement in this case. Such an endeavor would require Dr. Ofshe to assess the inconsistencies between Hall's statements to the police and the evidence presented at trial. Dr. Ofshe has no more expertise to perform this task than any juror. It is beyond Dr. Ofshe's knowledge as a social psychologist to assess the weight of the evidence and the credibility of witnesses. Of course, Dr. Ofshe can speak of the post-admission narrative statement as a technique by which social psychologists screen out true from false confessions in order to form systematic observations about them. He may even hypothesize to the jury that the post-admission narrative statement is a valid method by which to test the truth or falsity of a confession. However, he cannot go so far as to analyze Hall's post-admission narrative statement in this manner. That task is for the jury alone.

One final limitation, and one which the Court does not believe is in dispute, is that Dr. Ofshe cannot testify to Hall's psychological or psychiatric impairments or the effect of these impairments upon his likelihood of confessing falsely. Dr. Ofshe is not a clinical psychologist nor a psychiatrist and has no expertise in this area.

### *Helpful to the Trier of Fact*

In addition to requiring that the proposed expert be knowledgeable about the particular matter at issue and that his methods be reliable, Rule 702 also requires that his testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. The Seventh Circuit has indicated that social scientists in particular may be able to show that commonly accepted explanations for behavior are,

---

**5.** Another factor which adds some credibility to Dr. Ofshe's testimony is that he has written various articles debunking the repressed memory phenomenon as unsupported by sufficient scientific evidence. This is in sharp contrast to his testimony about the reliability of false confession evidence.

when studied more closely, inaccurate. *Tyus,* 102 F.3d at 263; *Hall,* 93 F.3d at 1345.

Dr. Ofshe testified that a common misperception among the public is that once a person confesses to his guilt, he must be guilty. Dr. Ofshe's expert testimony challenges this perception based on systematic observation of data to which the jury is not privy. If Defendant presents admissible testimony to show that the police used coercive interrogation techniques in his case, this would make Dr. Ofshe's expert testimony helpful to the trier of fact.

The problem is that Hall's account of the interrogation was given to his lawyer without having him swear under oath to the truth of that testimony. Moreover, Hall's testimony was not subject to cross-examination by the Government. Thus, the interview is not presently admissible. Unless Defendant can introduce some admissible testimony regarding the manner in which the interrogation occurred, such as testifying on the stand, the jury will not hear any evidence of coercive interrogation techniques and Dr. Ofshe's testimony would be rendered irrelevant.

Even if admissible evidence of coercive interrogation techniques are introduced, the Court reminds Defendant that Dr. Ofshe cannot testify about the significance of the post-admission narrative statement in Hall's case. Far from assisting the jury, such testimony would unduly usurp the jury's role as the trier of fact and cloak his factual determinations in the guise of expert testimony. Such testimony would simply be too prejudicial under Fed.R.Evid. 403 and will not be allowed.

### CONCLUSION

IT IS THEREFORE ORDERED that the Government's Motion to Preclude Dr. Ofshe's Testimony at Trial [Doc. # 164] is **DENIED** except to the extent discussed in this Order.