Robert Ferdinand FOWLER, Appellant,

v.

The STATE of Texas, Appellee.

No. 10–96–190–CR.

Court of Appeals of Texas,
Waco.

Nov. 26, 1997.

Discretionary Review Granted
March 11, 1998.

William D. Stoneburner, Belton, Walter M. Reaves, Jr., West, for appellant.

John W. Segrest, Crim. Dist. Atty., Beth Toben, Asst. Crim. Dist. Atty., Waco, for appellee.

Before DAVIS, C.J., and CUMMINGS and VANCE, JJ.

## OPINION

VANCE, Justice.

Robert Fowler was indicted for and charged with the offense of aggravated kidnapping. TEX.PEN.CODE ANN. § 20.04 (Vernon Supp.1997). Following a jury trial, Fowler was found guilty and withdrew his election for the jury to assess punishment. The court sentenced him to life in prison. Fowler appeals on five points of error. His first three points argue that the court erred

in admitting the testimony of Donna Gregory, a family violence counselor, when such testimony was not shown to be reliable, bolstered the testimony of the victim, was not relevant to any issue in the case, and was not on a subject beyond the experience and knowledge of most jurors. His fourth point complains of egregious harm resulting from the submission of a theory in the charge which was not alleged in the indictment. Finally, Fowler asserts that the finding that he did not voluntarily release the victim was against the great weight and preponderance of the evidence. We will affirm the judgment.

## FACTS

Robert and Carol Fowler married in June of 1994. After filing for divorce in October of 1995, Carol attempted a reconciliation with Fowler. Determining that their marriage would not work, Carol left him again on December 3. On Tuesday, December 5, Fowler followed her to work, honking his horn and driving recklessly while trying to run her off the road. When she finally stopped her vehicle, he forced her to leave it behind and get into his truck. He continuously threatened Carol's life, hitting her and scaring her with a shotgun. It was his goal, he told Carol, that they die together. Once he began to calm down, Fowler threw the gun out of the truck and drove to the Bellmead Police Department. He offered to let Carol go, but she did not leave for fear, she testified, that he would run over her once she got out of the truck. Fowler eventually drove to a motel where he intended for them to stay overnight before leaving town. The next morning, they were awakened by a phone call from the police indicating that they were surrounded and requesting that Fowler release Carol. He begged Carol to tell the police that she was with him willingly, but she refused. Fowler eventually opened the door and surrendered, leaving Carol alone in the motel room.

## THE CHARGE

 In his fourth point, Fowler asserts that the trial court erred in submitting a theory in the charge that was not alleged in the indictment. *See Gooden v. State,* 576 S.W.2d 382 (Tex.Crim.App.1979). We agree. Section 20.03 of the Penal Code defines kidnapping as intentionally or knowingly abducting another person. Abduction occurs by restraining a person with intent to prevent his liberation by 1) secreting or holding him in a place where he is not likely to be found or 2) using or threatening to use deadly force. TEX.PEN.CODE ANN. § 20.01(2) (Vernon 1994). Kidnapping is aggravated when the defendant:

> (a) intentionally or knowingly abducts another person with the intent to:
>> (2) use him as a shield or hostage; ...
>> (5) terrorize him or a third person; ...
> (b) intentionally or knowingly abducts another person and uses or exhibits a deadly weapon during the commission of the offense.

*Id.* § 20.04. The indictment alleged in pertinent part:

> [Fowler] did then and there with intent to use Carol Fowler as a hostage and to terrorize [her], and did then and there intentionally and knowingly abduct Carol Fowler by restricting [her] movements ... without her consent, so as to interfere substantially with her liberty, by moving her from one place to another, with the intent to prevent her liberation by secreting and holding her in a place where she was not likely to be found,

## DEADLY WEAPON ALLEGATION

And it is further presented to said Court that during the commission of the above described felony, the said Defendant did use and exhibit a deadly weapon, to-wit: a firearm, that in the manner of its use and intended use was capable of causing death and serious bodily injury.

The charge instructed the jury that aggravated kidnapping was kidnapping "committed with the intent to use [the victim] as a hostage, or to terrorize her; *or if the actor uses or exhibits a deadly weapon in the commission of the offense.*" Thus, the application paragraph authorized a conviction if the jury found that Fowler used or exhibited a deadly weapon when he abducted Carol. This was

improper. Although each of these are theories supported by the penal code under which one could be convicted of aggravated kidnapping, the indictment fails to charge Fowler with using or exhibiting a deadly weapon and, as a result, he could not be convicted on this basis.

Because the deadly weapon allegation was not included as part of the substantive offense in the indictment, *i.e.* it was not listed as an element of the crime, it could not support a conviction if the jury found Fowler used or exhibited a deadly weapon, but did not find that he used Carol as a hostage or terrorized her. Rather, the deadly weapon assertion in the second paragraph of the indictment served only to put Fowler on notice of the State's intention to seek a finding under Article 42.18 of the Code of Criminal Procedure.[1]

■ A defendant is entitled to some form of notice that the use of a deadly weapon will be a fact issue at trial. *Ex parte Beck,* 769 S.W.2d 525, 526 (Tex.Crim.App. 1989). In a jury case, the court is authorized to enter an affirmative finding as to whether a deadly weapon was used or exhibited during the commission of a felony in only three situations: when the jury has (1) found guilt as alleged in the indictment and the deadly weapon has been specifically pled as such using "deadly weapon" nomenclature in the indictment; (2) found guilt as alleged in the indictment but, though not specifically pled as a deadly weapon, the weapon pled is per se a deadly weapon; or (3) affirmatively answered a special issue on deadly weapon use. *Davis v. State,* 897 S.W.2d 791, 793 (Tex. Crim.App.1995). Although due process does not require that such notice appear in the indictment, it "probably should appear there." *Ex parte Patterson,* 740 S.W.2d 766, 776 (Tex.Crim.App.1987). Thus, to ensure that the defendant receives adequate notice, it is advisable to allege the use or exhibition

of a deadly weapon in the indictment. In the present case, the indictment has been used for dual purposes. On one hand, it is the written statement of the grand jury accusing Fowler of aggravated kidnapping under section 20.04(a) of the Penal Code. *See id* at 775. On the other hand, the indictment gives Fowler notice of the State's intention to seek a finding under Article 42.18 of the Code of Criminal Procedure. Because the indictment did not allege aggravated kidnapping by using a deadly weapon as is authorized under 20.04(b), but rather alleged only that Fowler kidnapped Carol with the intent to terrorize her, or use her as a hostage, the charge should have been limited to those theories.

■ Because there was no objection to the charge, we must review the record to see if the charge error—authorizing a conviction on a theory not alleged in the indictment—was so egregious that Fowler was denied a fair and impartial trial. *Almanza v. State,* 686 S.W.2d 157, 160 (Tex.Crim.App.1984). In *Ross v. State,* a similar question was held to be "fundamental and calculated to injure the rights of the appellant to the extent that he has not had a fair trial." 487 S.W.2d 744, 745 (Tex.Crim.App.1972). The court went on to say that the harm required reversal because the evidence was insufficient to support a conviction under the allegations in the indictment. *Id.* However, in *Lang v. State* the Dallas Court reached a different result under *Almanza*[2] when the evidence was found to be sufficient to support the conviction under the allegations of the indictment. *Lang v. State,* 698 S.W.2d 223, 226 (Tex.App.—Dallas 1985, no pet.).

We find the evidence sufficient to support a conviction of the offense alleged in the indictment. First, the evidence that Fowler intended to terrorize Carol is overwhelming. There is Carol's corroborated testimony that Fowler forced her off the road and into his

---

1. Article 42.18, section 8(b)(3) of the Code of Criminal Procedure reads in relevant part:

 if the judgment contains an affirmative finding under [Article 42.12(3g)(2) ], [a prisoner] is not eligible for release on parole until his actual calendar time served, without consideration of good conduct time, equals one-third of the maximum sentence or thirty calendar years,

whichever is less, but in no event shall he be eligible for release on parole in less than two calendar years.

TEX.CODE CRIM.PROC.ANN. art. 42.18 (Vernon Supp. 1997).

2. The harm test under *Almanza* had not yet been determined when *Ross* was decided.

truck. She testified that he threatened to kill her multiple times, claiming that they were going to die together, that she would never see her children again, and that her brains would be "splattered all over the place" if she resisted. Second, there is sufficient evidence to warrant a finding that Fowler intended to use Carol as a hostage. Once the police had him surrounded, Fowler spent approximately forty-five minutes with Carol trying to convince her to tell the police she was there voluntarily. During this entire time, he refused to let Carol speak with the police or leave the room. Both the hostage theory and the theory that he terrorized her are supported by the evidence.

Recently, the Court of Criminal Appeals held in *Malik v. State* that the sufficiency of the evidence should be measured by the elements of the offense as defined by the "hypothetically correct jury charge for the case." 953 S.W.2d 234, 239 (Tex.Crim.App. 1997). Such a charge would be one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id.* Using this analysis, we would reach the same answer. The evidence is sufficient to sustain the conviction for the indicted offense using a hypothetically correct charge.

One other factor requires examination. In *Lang*, the Dallas Court held that having determined the evidence to be sufficient was not enough. "[F]urther analysis is required because the converse of the *Ross* holding does not necessarily follow: a charge authorizing conviction on a theory not alleged in the indictment is not necessarily free from egregious error, even though the evidence is sufficient to support the allegations of the indictment." *Lang*, 698 S.W.2d at 225. The *Lang* opinion then addressed the appellant's claim that he was denied notice of and an opportunity to defend against the theory submitted in the charge. Fowler does not, however, complain of any lack of notice or opportunity to defend, rather, he suggests that the fact that there was no dispute as to the presence of a weapon allowed the jury to avoid the truly contested issue of whether Carol went with him and stayed with him voluntarily. He asserts that merely because the verdict may have been based on the improperly submitted theory, he has suffered egregious harm.

When determining whether a defendant suffered egregious harm, we must examine whether the error affected the very basis of the case, deprived the defendant of a valuable right, or vitally affected his defensive theory. *Hutch v. State*, 922 S.W.2d 166, 172 (Tex.Crim.App.1996). We believe that because the evidence is sufficient to support a conviction under the indictment, it cannot be said that the basis of the case was affected nor that Fowler was deprived of a valuable right. *Id; Lang*, 698 S.W.2d at 226. Egregious harm could have occurred only if Fowler's defensive theory was affected. We find that it was not. Because he could not dispute the presence of the gun, Fowler's only line of defense was to attack Carol's credibility, whether the charge included the additional theory or not. Thus, any harm he suffered as a result of the erroneous charge was not egregious and does not require reversal. *Almanza*, 686 S.W.2d 157. Point four is overruled.

## SUFFICIENCY OF THE EVIDENCE OF RELEASE

After the jury found Fowler guilty, the court assessed his punishment at life in prison. In his fifth point, Fowler suggests that the court's failure to find that he voluntarily released the victim is against the great weight and preponderance of the evidence. We disagree. Section 20.04 of the Penal Code provides that "at the punishment phase of a trial, a defendant may raise the issue of whether he voluntarily released the victim in a safe place. If the defendant proves the issue in the affirmative by a preponderance of the evidence, the offense is a felony of the second degree." Tex.Pen.Code Ann. § 20.04. The proper standard is whether "considering all the evidence relevant to the issue at hand, the judgment is so against the great weight and preponderance of the evidence as to be manifestly unjust." *Meraz v. State*, 785 S.W.2d 146, 154–55 (Tex.Crim.App.1990);

*Moranza v. State,* 913 S.W.2d 718, 724 (Tex. App.—Waco 1995, pet. ref'd).

Once the police surrounded the motel in which Fowler and Carol were staying, they demanded that Fowler release Carol and surrender. After approximately thirty to forty-five minutes, Fowler opened the door and came out, leaving Carol unharmed but crying inside the room. We believe this evidence is sufficient to support a finding that Fowler never "released" the victim. The police asked him to release her, but he did not. When he finally surrendered, the police found Carol in the motel room. Because there was no release, Fowler cannot be said to have voluntarily released her. Point five is overruled.

## EXPERT WITNESS TESTIMONY

 Fowler's first three points complain that the trial court erred in allowing Donna Gregory, a family violence counselor, to testify as an expert witness. He initially argues that admitting the testimony was error because it improperly bolstered Carol's testimony. He did not object on this basis at trial and, as a result, waived review of this point. *See Cook v. State,* 858 S.W.2d 467, 474 (Tex.Crim.App.1993); *Webb v. State,* 899 S.W.2d 814, 818 (Tex.App.—Waco 1995, pet. ref'd) (An objection on one legal theory will not support a point of error on a different theory). Fowler's second and third points question the relevancy and the reliability of the expert's testimony, where the State did not attempt to establish the admissibility of the evidence under *Kelly v. State.* 824 S.W.2d 568 (Tex.Crim.App.1992). We will address these points simultaneously.

## THE DISPUTED EVIDENCE

Gregory, the State's expert, testified regarding domestic violence and the problems it creates for the victims generally, and also about the specific counseling she had done with Carol Fowler. Her education and experience consisted of an M.A. in Psychology, a two-thousand hour internship at the Family Abuse Center in Waco, and one year of private practice. She also indicated that she had attended several workshops and seminars. After answering questions regarding her education and experience, Gregory began her testimony regarding family violence, the common long-term responses to that violence, and whether Carol Fowler exhibited those responses. It appears from the record that her testimony was based solely on personal experience.

## STANDARD FOR ADMISSIBILITY UNDER RULE 702

Rule 702 of the Rules of Criminal Evidence, which governs the admission of expert testimony, provides as follows:

> If scientific, technical, or *other specialized knowledge* will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

TEX.R.CRIM.EVID. 702 (emphasis added). It is identical to Federal Rule 702 and Texas Rule of Civil Evidence 702.

This rule contains three requirements for the admission of expert testimony: (1) the witness must be qualified; (2) the proposed opinion testimony must be grounded in "scientific, technical, or other specialized knowledge"; and (3) the testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.; Robinson,* 923 S.W.2d 549, 556 (Tex.1995) (referring to the Texas Rules of Civil Evidence). The Court of Criminal Appeals has held that testimony regarding scientific evidence offered pursuant to Rule 702 of the Rules of Criminal Evidence must be relevant and reliable. *See Kelly,* 824 S.W.2d at 573.

 The threshold determination for a trial court to make regarding the admission of expert testimony based on "scientific knowledge" is whether that testimony will help the trier of fact understand the evidence or determine a fact in issue. *Id.* at 572. Once it is determined that the proffered evidence will assist the trier of fact, the trial court must determine whether the testimony is relevant. *Id.* To be relevant, the proposed testimony must be "sufficiently tied to the facts of the case that it will assist the trier of fact in resolving a factual dis-

pute." *Robinson*, 923 S.W.2d at 556. Next, the trial court must establish that the evidence is sufficiently reliable to help the jury in reaching accurate results. *Kelly*, 824 S.W.2d at 573. The proponent of scientific evidence has the burden of proving its relevancy as well as the scientific reliability by clear and convincing evidence. *Id.* Unreliable scientific evidence simply will not assist the jury to understand the evidence or accurately determine a fact in issue; such evidence obfuscates rather than leads to an intelligent evaluation of the facts. *Id.* If the judge determines that the testimony is both relevant and reliable, he must then determine whether its probative value is outweighed by the "danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." [3] *Robinson*, 923 S.W.2d at 557; *see Kelly*, 824 S.W.2d at 572.

 To satisfy his reliability burden, the proponent of the evidence must make a technical showing, outside the presence of the jury, demonstrating: (1) a valid underlying scientific theory, (2) a valid technique applying the theory, and (3) that the technique was properly applied on the occasion in question. *See Kelly*, 824 S.W.2d at 573. Additionally, there are several factors that may influence a trial court's determination of reliability. These include: (a) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if ascertainable; (b) the qualifications of the expert testifying; (c) the existence of literature supporting or rejecting the underlying theory and technique; (d) the potential rate of error of the

technique; (e) the availability of other experts to test and evaluate the technique; (f) the clarity with which the underlying theory and technique can be explained to the court; and (g) the experience and skill of the person who applied the technique on the occasion in question. *See id.*[4]

## PRESERVATION OF COMPLAINT

 In *Kelly*, the Court states that once the party opposing the evidence objects, the proponent bears the burden of demonstrating its admissibility. The State urges us to find that Fowler never properly objected, the State never had a burden to demonstrate admissibility under *Kelly*, and error was not properly preserved.

Fowler first raised the admissibility question in a motion in limine, requesting that the court order the State "not to call any expert witness before the jury until the Court has had an opportunity to determine qualifications and such competency of the witness to testify." His motion was granted.

The State attempted to offer Gregory's testimony during its case-in-chief. Fowler objected that she had limited experience, had only testified a few times, and that her testimony referred to family abuse. The State responded that *Fielder* and *Duckett* both recognize the use of experts to explain behavior that would not be ordinarily understandable to the jury. *See Fielder v. State*, 756 S.W.2d 309 (Tex.Crim.App.1988); *Duckett v. State*, 797 S.W.2d 906 (Tex.Crim.App.1990).[5]

The court then indicated reservations about whether the subject matter of Gregory's testimony was outside the understanding

---

**3.** We note that the Supreme Court does not appear to require a Rule 403 objection prior to the trial court balancing the probative value against unfair prejudice, confusion of the issues, etc. It appears that a Rule 403 balancing test is required in order for the trial court to determine if the testimony will assist the jury.

**4.** This is the same standard used by the United States Supreme Court and the Texas Supreme Court. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589–90, 113 S.Ct. 2786, 2795, 125 L.Ed.2d 469 (1993); *E.I. du Pont de Nemours and Co., Inc. v. Robinson*, 923 S.W.2d 549, 556 (Tex.1995). In *Daubert*, the Court stated that Rule 702 of the Federal Rules of Evi-

dence requires scientific expert testimony to be relevant and reliable. Rule 702, the Court noted, requires the proffered testimony to be: (1) "scientific knowledge" (2) which will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, 509 U.S. at 589, 113 S.Ct. at 2795. To constitute "scientific knowledge," the proffered testimony must be reliable, and to be helpful to the trier of fact, the evidence must be relevant, *i.e.*, have a valid scientific connection to the pertinent inquiry. *Id.*

**5.** Both *Fielder* and *Duckett* were decided prior to *Kelly*.

of the jury and expressed concern about its admissibility. Fowler agreed. At this point, the State withdrew its offer of the evidence. On rebuttal, the State re-offered the testimony and Fowler objected to relevancy, hearsay, denial of due process, prejudice, and competency of the evidence.

▮ To preserve a complaint for appellate review, a party must have presented to the trial court a timely objection stating the specific grounds for the objection, if the grounds are not apparent from the context. TEX.R.APP.P. 33.1. All a party has to do to avoid the forfeiture of a complaint on appeal is to let the trial judge know what he wants, why he thinks himself entitled to it, and to do so clearly enough for the judge to understand him at a time when the court is in a position to do something about it. *Lankston v. State,* 827 S.W.2d 907, 909 (Tex.Crim.App. 1992). Although his objection was far from model, using this test we believe that Fowler sufficiently relayed his objections to the court. Regarding Gregory's lack of experience and the testimony's inability to assist the jury, Fowler made clear objections. Likewise, he properly objected to the relevancy of the evidence. Essentially, we believe Fowler's objection preserved his complaint about the admissibility of Gregory's testimony under *Kelly.*

## SCIENTIFIC KNOWLEDGE VS. SPECIALIZED KNOWLEDGE

▮ Some have suggested that we distinguish between "scientific knowledge" and "specialized knowledge." The testimony in question in this case, should a distinction be necessary, would be categorized as "specialized knowledge." The State urges us to accept the proposition that *Kelly* does not apply to psychological sciences, as they are not susceptible to the same scrutiny as the "hard sciences" and thus, fall out of the category of "scientific knowledge."[6] Testi-

mony of behavioral sciences, the State claims, may be necessary to assist the trier of fact with the significance of behavior that the jury may not understand. This testimony, it argues, is more like the expert testimony in *Duckett* and *Fielder,* where it was offered to rehabilitate another witness. *Duckett,* 797 S.W.2d at 920; *Fielder,* 756 S.W.2d at 320. The State also urges that, under *Duckett,* the evidence has greater probative value as rebuttal evidence after the victim has been impeached. However, in *Duckett,* the Court of Criminal Appeals held that the proper inquiry was whether the testimony was "otherwise admissible" under the rules of evidence. *Id.* Because *Kelly* was decided post-*Duckett,* we must examine the evidence in light of *Kelly.*

Additionally, relying on Justice Daughinot's concurrence in *Forte v. State,* the State urges that "testimony on subjects such as domestic violence, battered spouse syndrome, and sexual assaults, is not amenable to the *Kelly* test." 935 S.W.2d 172 (Tex.App.—Fort Worth 1996, pet. ref'd). However, in both *Forte* and *Jordan v. State* a majority of the Fort Worth court addressed the issue differently. *Id;* 950 S.W.2d 210 (Tex.App.—Fort Worth 1997, pet. filed) (both cases dealt with the admissibility of expert testimony regarding the reliability of eyewitness testimony). In *Jordan,* because the case was on remand with a directive to "determine whether the testimony was sufficiently reliable under Rule 702," the court assumed that the Court of Criminal Appeals intended *Kelly* to apply, since it "applies to all scientific evidence offered under Rule 702."[7] *Id.* at 212. We likewise believe that this was the intention of the Court of Criminal Appeals. Knowing that the testimony in question regarded the reliability of eyewitness testimony, the Court detailed the history of Rule 702, including *Kelly, Daubert,* and *Robinson.* The State, nevertheless, argues that there is no basis

---

**6.** In considering whether *Daubert* applies to the soft sciences, a look at pre-*Daubert* decisions shows that the United States Supreme Court made no distinction between soft and hard scientific evidence. "There is nothing in the decisions of the United States Supreme Court which indicates that expert testimony concerning human motivation and behavioral sciences, or what

some call 'soft' scientific evidence, is subject to a set of rules different from other expert testimony." Charles Bleil, *Evidence of Syndromes: No Need for a "Better Mousetrap,"* 32 S.TEX.L.J. 37, 74 (1990).

**7.** *See Jordan v. State,* 928 S.W.2d 550 (Tex.Crim. App.1996).

for conducting a reliability hearing for psychological evidence because it is unlike scientific knowledge, which must be derived by the scientific method and appropriately validated and no such method is used in the psychological context. *Nations v. State,* 944 S.W.2d 795 (Tex.App.—Austin 1997, pet. filed); *Daubert,* 509 U.S. at 590, 113 S.Ct. at 2796. We find this argument to be unpersuasive.

In *Nations,* the Austin Court was directed by the Court of Criminal Appeals to reconsider the exclusion of expert testimony regarding the reliability of eyewitness testimony in light of its remand of *Jordan v. State,* 928 S.W.2d 550 (Tex.Crim.App.1996). The Austin Court recognized that Rule 702 places the trial judge in the role of a "gatekeeper" who must ensure that scientific testimony is not only relevant but reliable, but questioned whether "under the current law in this state interpreting Rule 702 ... it is appropriate to conduct a hearing on the reliability of evidence from the field of psychology." *Nations,* 944 S.W.2d at 800. However, after questioning whether this type of evidence should undergo a *Kelly* analysis, the court in fact subjected it to such an analysis. *See id.* at 801–02.

Additionally, we believe the Court of Criminal Appeal's decision in *Jordan* dictates that *Kelly* applies to "specialized knowledge," specifically the field of psychology. 928 S.W.2d 550. Likewise, *Daubert,* the federal equivalent of *Kelly,* has been applied to psychological testimony. In *Gier v. Educational Service Unit No. 16,* the Eighth Circuit Court of Appeals affirmed the trial court's limitation of expert testimony regarding evaluation of mentally retarded students, holding that the testimony was unreliable under *Daubert.* 66 F.3d 940 (8th Cir.1995). "Under *Daubert,* a district court must engage in an assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 943. Similarly, in *State v. Foret* the Louisiana Supreme Court adopted the *Daubert* standard where a child psychologist testified to "Child Sexual Abuse Accommodation Syndrome." 628 So.2d 1116 (La.

1993). "Psychodynamic theories on the explanation of human behavior is, at best, a science that is difficult to impossible to test for accuracy. This untestability comes from its very nature as an opinion as to the causes of human behavior, and the fact that the methods for testing the results of psychoanalysis are rife with the potential for inaccuracy." *Id.* at 1125. "This type of evidence is of highly questionable scientific validity, and fails to unequivocally pass the *Daubert* threshold test of scientific reliability." *Id.* Similarly, in *Forte v. State, Kelly* was applied to determine the reliability of expert testimony regarding eyewitnesses. 935 S.W.2d 172. In concluding that the testimony was not reliable, the court held:

> [A]ppellant in the instant case did not meet his burden of proving either the validity of the scientific theories underlying [the] expert testimony or the validity of the method used for applying the theories. There is no evidence that the theories underlying [the] expert testimony are accepted as valid by the relevant scientific community, or that the alleged existing literature on the theories support or reject these theories. Although [the witness] stated that there was a 'very large body' of literature concerning eyewitness identification, he only mentioned the name of one other person who purports to be an expert in the field and he failed to identify or produce the scientific literature that he allegedly relied on to reach his conclusions.

We can find no reason why evidence regarding the "soft sciences" is not susceptible to *Kelly.* Rule 702 applies to all testimony given by experts. What the trial court's screening for reliability accomplishes is the elimination of an unsubstantiated, unsupported opinion, *i.e.,* one person's opinion. We cannot legitimately exclude certain expertise from the reliability requirement merely because some critics feel "the criteria used to evaluate scientific testimony cannot be properly applied to fields of expertise which are not based on the scientific method." *Nations,* 944 S.W.2d at 800; *see Hartman v. State,* 946 S.W.2d 60, 63 (Tex.Crim.App.1997) (Rule 702 applies to all scientific evidence, not just "novel" scientific evidence). The fact that it may be more difficult to assess

the reliability of testimony regarding the "soft sciences" does not justify eliminating the reliability requirement. We believe that the rule itself extends the responsibility of the trial court as "gatekeeper" to screening evidence from the soft sciences for reliability. *See Nations,* 944 S.W.2d at 800. Whether such evidence will assist the jury in making an intelligent evaluation of the facts rather than obfuscating them depends largely on the reliability of the testimony. *See Kelly,* 824 S.W.2d at 573.

Rule 702 makes no distinction between scientific, technical, or specialized knowledge. The evidence under the rule is treated collectively. Thus, until we are directed (1) how to differentiate between "scientific knowledge" and "specialized knowledge," and (2) what is the appropriate standard for reviewing testimony from an expert with "specialized knowledge," we are not persuaded that this is a necessary distinction. If the specialist who is testifying cannot explain to the court a theory used to reach his or her conclusions, the way that theory is applied by others with the same "specialized knowledge," and the way it will be applied in the present case, why should such evidence be said to be reliable enough that it will assist a jury? In making this determination about scientific evidence, *Kelly* lists seven *nonexclusive* factors for the trial court to consider. We acknowledge that each of the factors may not be satisfied by the proponent of the evidence. Indeed, all may not apply. There may be others. We believe that if at least some of the *Kelly* factors cannot be satisfied, then the testimony should be excluded.

We conclude that the court should have required that Gregory explain her theory, her technique, and how she applied that technique under the *Kelly* reliability test.

## APPLICATION OF *KELLY*

 Our review of the record reveals that the State failed to present sufficient evidence of the validity of the scientific theories underlying Gregory's testimony and the validity of the techniques used to apply the theories. Apart from establishing her quali-

fications and experience, not a single *Kelly* factor was met. The evidence does not show whether Gregory's theories are accepted as valid, nor whether a single piece of literature has been written to support her testimony. Likewise, whether Gregory has ever conducted research to test the validity of her theories or been subjected to peer review does not appear in the record. Whether or not the underlying theory and technique could be clearly explained is also unknown, considering that no attempt was made. In short, we find that the State, as the proponent of this evidence, failed to make an adequate showing of a valid underlying scientific theory, a valid technique applying the theory, or that any technique at all was applied in the present case. As a result, we find that the expert testimony fails to meet the *Kelly* test for admissibility and thus was improperly admitted.

## HARM ANALYSIS

Having found that there was error in the admission of the testimony, we must determine whether or not it was harmless. Rule of Appellate Procedure 44.2 governs how harm is assessed after error is found in criminal cases.

## CONSTITUTIONAL ERROR

Subsection (a) governs constitutional error, where "the court of appeals must reverse . . . unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." TEX. R.APP.P. 44.2(a). *Chapman v. California,* which governed the harm analysis under former Rule 81(b)(2) still applies under Rule 44.2(a). 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Harm is assessed as set forth in *Harris v. State,* 790 S.W.2d 568, 583–88 (Tex.Crim.App.1989).

## NON–CONSTITUTIONAL ERROR

Subsection (b) provides: "Any [non-constitutional] error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." TEX.R.APP.P. 44.2(b). The language in 44.2(b) mirrors that found in Federal Rule of Criminal Procedure 52(a).[8]

8. Federal Rule 52(a) states: "Any error, defect, irregularity or variance which does not affect

substantial rights shall be disregarded." *See* FED. R.CRIM P. 52(a).

The United States Supreme Court thoroughly considered Rule 52(a) in *Kotteakos v. United States,* adopting a standard used by federal courts when doing a harm analysis. 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). Because of the similarity of the rules, we turn to *Kotteakos* and its progeny for guidance in applying our new standard.

 In applying the test for "harmless error," our primary question is what effect the error had, or reasonably may have had, upon the jury's decision. We must view the error, not in isolation, but in relation to the entire proceedings. *Id.* at 764, 66 S.Ct. at 1247; *United States v. Brown,* 692 F.2d 345, 350 (5th Cir.1982); *United States v. Rea,* 958 F.2d 1206, 1220 (2nd Cir.1992). An error is harmless if the reviewing court, after viewing the entire record, determines that no substantial rights of the defendant were affected because the error did not influence or had only a slight influence on the verdict. *See United States v. DeAngelo,* 13 F.3d 1228, 1233 (8th Cir.1994) (citing *United States v. Flenoid,* 949 F.2d 970, 973 (8th Cir.1991)). Stated another way, an error is harmless if the court is sure, after reviewing the entire record, that the error did not influence the jury or had but a very slight effect on its verdict. *Id.; United States v. Heller,* 625 F.2d 594, 599 (5th Cir.1980); *United States v. Underwood,* 588 F.2d 1073, 1076 (5th Cir. 1979); *United States v. Arias–Diaz,* 497 F.2d 165, 171 (5th Cir.1974).

 The true inquiry, as stated in *Kotteakos,* is not whether there has been a variance of proof, but whether there has been such a variance as to "affect the substantial rights" of the accused. 328 U.S. at 756, 66 S.Ct. at 1243 (citing *Berger v. United States,* 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935)).

> If, when all is said and done, the [court] is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of [the legislature]. But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that

the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

*O'Neal v. McAninch,* 513 U.S. 432, 436–38, 115 S.Ct. 992, 995, 130 L.Ed.2d 947 (1995) (citing *Kotteakos,* 328 U.S. at 765, 66 S.Ct. at 1248).

 The error must have affected the outcome of the lower court proceedings. *United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 1778, 123 L.Ed.2d 508 (1993); *see Bank of Nova Scotia v. United States,* 487 U.S. 250, 255–57, 108 S.Ct. 2369, 2373–74, 101 L.Ed.2d 228 (1988). That is to say, if we have "grave doubts" about whether an error did not affect the outcome, we must treat the error as if it did. *United States v. Lane,* 474 U.S. 438, 449, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986). "Grave doubt," means that, "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *O'Neal,* 513 U.S. at 433–36, 115 S.Ct. at 994. The uncertain judge should treat the error, not as if it were harmless, but as if it affected the verdict (*i.e.,* as if it had a "substantial and injurious effect or influence in determining the jury's verdict"). *Id.*

### WHO HAS THE BURDEN?

 To answer this question, we look to the way other harm analyses are conducted.

In considering harm flowing from trial error, the United States Supreme Court and the Court of Criminal Appeals have used similar standards. On habeas review of constitutional trial errors, both have applied the *Kotteakos* standard instead of the greater *Chapman* standard because of the nature and purpose of collateral review. *See Kotteakos,* 328 U.S. at 765, 66 S.Ct. at 1248; *Chapman,* 386 U.S. at 24, 87 S.Ct. at 828 (the standard for determining whether a conviction must be set aside because of federal

constitutional error is whether the error "was harmless beyond a reasonable doubt"). Practically, the burden of proving that the error contributed to the conviction or punishment requires the habeas petitioner to show harm by a preponderance of the evidence. *See Brecht v. Abrahamson,* 507 U.S. 619, 630, 113 S.Ct. 1710, 1717, 123 L.Ed.2d 353 (1993); *O'Neal,* 513 U.S. at 433–38, 115 S.Ct. at 994–5; *Ex parte Fierro,* 934 S.W.2d 370, 372 (Tex.Crim.App.1996).

Harm flowing from constitutional trial errors on direct review has been considered under the *Chapman* standard, with both courts placing the burden of demonstrating harmlessness on the prosecution. *See Brecht,* 507 U.S. at 630, 113 S.Ct. at 1717; *Ex parte Fierro,* 934 S.W.2d at 372. Thus, we look to the federal courts for guidance in placing the burden under our new standard for direct review of non-constitutional trial errors. The United States Supreme Court intentionally phrased the issue of reviewing such errors in terms of "grave doubt." *O'Neal,* 513 U.S. at 433–38, 115 S.Ct. at 994–5. "The case before us does not involve a judge who shifts a burden to help control the presentation of evidence at a trial, but rather involves judges who apply a legal standard (harmlessness) to a record that the presentation of evidence is no longer likely to affect." *Id.* at 436–38, 115 S.Ct. at 995. The judge should ask, "Do I, the judge, think that the error substantially influenced the jury's decision?" and not try to put the same question in terms of proof burdens. *Id.* Thus, we believe that neither party should have a burden under Rule 44.2(b).

SUMMARY.

In summary, when we assess harm under Rule 44.2(b) flowing from non-constitutional error, we review the entire record to determine whether the error had more than a slight influence on the verdict. If we find that it did, we must conclude that the error affected the defendant's rights in such a way as to require a new trial. If we have grave doubts about its effect on the outcome, we should find that the error was such as to require a new trial. Otherwise, we should disregard the error.

## APPLICATION OF THE HARM ANALYSIS

The admission of Gregory's testimony was a non-constitutional error. Applying the new harm analysis, we conclude that the introduction of Gregory's testimony did not have more than a slight influence on the verdict; thus, Fowler's substantial rights were not affected. TEX.R.APP.P. 44.2(b). We recognize that under the old standard, we would reach a different result. Prior to the adoption of new Rule 44.2(b), we would have been compelled to determine beyond a reasonable doubt that the admission of Gregory's testimony made no contribution to the conviction or to the punishment. *See* TEX. R.APP.P. 81(b)(2) (repealed 1997). Because Fowler's sole defense was to impeach Carol's credibility, and the expert testimony served to bolster her testimony, we could not say beyond a reasonable doubt that the testimony did not contribute to the conviction. However, in applying the less stringent new rule, we reach a different result.

We cannot say that the outcome would have been different without Gregory's testimony because the evidence of Fowler's guilt is overwhelming. Even without the expert testimony, there was sufficient corroborating evidence to support a jury determination that Carol was credible when she testified that she did not go with Fowler voluntarily. Two witnesses testified that they observed Fowler driving in a dangerous and reckless manner. Teresa Kirkpatrick testified that she saw Fowler cut across the lanes of traffic and run Carol off the road. Joseph Stephens testified that he observed Fowler's pickup and Carol's car in his driveway, with Fowler leaning in the driver's side of Carol's car, "pulling and jerking on someone" and yelling "get out of the car, get out of the car now!" He testified that he could hear a female voice inside saying "no" over and over again. Stephens stated that he went inside to call 9–1–1, and when he returned, the two people were gone, the pickup was gone, and the car was left in the middle of the driveway. Finally, there was the testimony of multiple peace officers that it was their belief that Fowler was holding Carol against her will at the motel and that Carol was not there vol-

untarily. The officers testified that their experience with Fowler indicated that he would not allow Carol to leave the motel room, although he did eventually surrender.

The jury was also aware that Fowler attempted to and in fact did escape from jail while awaiting trial. From this information, the jury could have deduced "consciousness of guilt." Likewise, testimony that Fowler was soliciting someone to convince Carol not to testify against him was introduced.[9] The jury could have accepted this action as evidence of guilt. After a thorough review of the record, we cannot say that Gregory's testimony had more than a slight influence on the verdict. We find that Fowler's substantial rights were not affected; thus, no harm was suffered. TEX.R.APP.P. 44.2(b). Points two and three are overruled.

The judgment is affirmed.

---

**9.** A letter written by Fowler was introduced. The letter read in part:

I wish you would kick her a--! But what good will that do? What we need to accomplish is getting her not to testify in court. If she don't go to court then they don't have no case. Or if she won't proceed with this, then they have no case. That's why you have to talk to her. Convince her to let me off the hook and I will never go near her again.