# NO. 12-08-00432-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *WILLIAM THOMAS LANTRIP JR.,*<br>*APPELLANT* | § | *APPEAL FROM THE THIRD* |
| *V.* | § | *JUDICIAL DISTRICT COURT OF* |
| *THE STATE OF TEXAS,*<br>*APPELLEE* | § | *ANDERSON COUNTY, TEXAS* |

### *MEMORANDUM OPINION*

Appellant William Thomas Lantrip Jr. was convicted of driving while intoxicated. In his sole issue, Appellant claims that the trial court reversibly erred by allowing improper expert testimony. We affirm.

### BACKGROUND

Appellant was charged by indictment with driving while intoxicated. As charged, the offense constituted a third degree felony. Appellant pleaded not guilty and, following a jury trial, the jury found Appellant guilty of the charged offense. Appellant pleaded true to two enhancement paragraphs. The trial court assessed Appellant's punishment at imprisonment for forty-five years. This appeal followed.

### EXPERT TESTIMONY

In his sole issue, Appellant argues that the trial court reversibly erred by allowing improper expert testimony from Trooper Lynn Hubert of the Texas Highway Patrol. Appellant asserts that the trial court should have sustained his objection to the State's attempt to elicit expert testimony from

Trooper Hubert regarding the correlation between performance on the"one-leg stand" standardized field sobriety test and blood alcohol concentration. Trooper Hubert was allowed to testify that "the studies show" that a person who exhibits two or more standardized signs of impairment will have a blood alcohol concentration (BAC) above 0.08. We have assumed, without deciding, that the trial court should not have allowed the testimony in question. *Cf. Emerson v. State*, 880 S.W.2d 759, 768-69 (Tex. Crim. App. 1994) (addressing the proper scope of testimony relating to another standardized field sobriety test).

**Standard of Review**

The erroneous admission of Trooper Hubert's expert testimony was nonconstitutional error. *See Fowler v. State*, 958 S.W.2d 853, 866 (Tex. App.–Waco 1997), *aff'd*, 991 S.W.2d 258 (Tex. Crim. App. 1999). Nonconstitutional error that does not affect the substantial rights of the defendant must be disregarded. Tex. R. App. P. 44.2(b). Substantial rights are not affected by the erroneous admission of evidence if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). In conducting a harm analysis, an appellate court should consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the trial court's instructions to the jury, the state's theory, any defensive theories, closing arguments, and even voir dire if material to the appellant's claim. *Motilla*, 78 S.W.3d at 355-56; *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000). Other factors to be considered are the nature of the evidence supporting the verdict, the character of the alleged error, and how the evidence might be considered in connection with the other evidence in the case. *Motilla*, 78 S.W.3d at 355; *Morales*, 32 S.W.3d at 867. Whether the state emphasized the error can also be a factor. *Motilla*, 78 S.W.3d at 356.

**Discussion**

The State presented one witness, Trooper Hubert, at the guilt/innocence stage of trial. Appellant did not testify and brought no witnesses on his behalf.[1] Trooper Hubert testified that he had served in the Texas Highway Patrol for six years and that he was an advanced level certified

---

[1] The complained of testimony by Trooper Hubert had not been previously alluded to by either party during voir dire or opening statements.

peace officer. He also discussed his training at the state trooper academy and his routine training after his graduation from the academy. This included a discussion of his training in the detection of intoxication and the administration of three standardized field sobriety tests. He stated that, as a result of his training, he had reached certified practitioner status in the administration of these three tests.

Trooper Hubert testified that he stopped Appellant for driving at a speed of ninety-one miles per hour in a fifty-five miles per hour speed zone. When Appellant got out of his vehicle, he accidentally left the driver's door open. Appellant failed to bring his driver's license with him when he stepped out of his vehicle and had to return to the vehicle to retrieve it. Appellant's eyes were "extremely red and bloodshot" and he smelled of alcohol. During Trooper Hubert's initial questioning of him, Appellant would not "directly face" Trooper Hubert. Trooper Hubert asked Appellant "if he had been drinking." Appellant replied, "I've had a few, yes, sir." Appellant subsequently attempted to limit this statement by indicating that had consumed "a couple" unspecified alcoholic beverages.

Trooper Hubert explained that he administered the three standardized field sobriety tests to Appellant. He denominated these tests as the "horizontal gaze nystagmus" test, the "walk-and-turn" test, and the "one-leg stand" test.[2] He testified as follows regarding the "horizontal gaze nystagmus" (HGN) test:

> Q. So when we're talking horizontal gaze nystagmus then, we're looking - - what are you looking for?
>
> A. The horizontal gaze nystagmus is - - is the involuntary jerking of the eye as they gaze to the side.
>
> . . . .
>
> Q. And what is the purpose then or why are we looking at HGN when we're talking about intoxicated drivers?
>
> A. Through the studies that have been done, the HGN is one of the more reliable sources or tests that we administer on the side of the road as far as determining whether an individual is intoxicated or not.

---

[2] A basic description of these three tests can be found in *Smith v. State*, 65 S.W.3d 332, 343 n.2, 344 n.3, 345 n.5, 346 nn.6-8 (Tex. App.–Waco 2001, no pet.).

Q. Does alcohol affect your nystagmus?

A. Yes, it does.

. . . .

Q. Is there what's called a decision point in this?

A. According to the studies that have been performed, if you observe more than four clues [standardized signs of impairment], then it's an eighty-eight percent chance that the subject's BAC is going to be above 0.08. So the deciding factor is four or more.

. . . .

Q. And so did you conduct the HGN then on Mr. Lantrip?

A. Yes, I did.

. . . .

Q. Okay. So how many clues did he have?

A. A total of six.

Q. And how many were the maximum?

A. Six. Six clues is all that can be observed.

Similarly, Trooper Hubert testified as follows regarding the "walk-and-turn" test:

Q. And then how many clues are total on this test[?]

. . . .

A. There's a total of eight clues in the walk-and-turn test.

. . . .

Q. And is there a decision point on this test?

A. Two or more clues, according to the study, indicates that a person's BAC will be above a .08.

. . . .

Q. And then did he then try to perform the test?

A. Yes, there were clues of impairment observed.

Q. Okay. How many clues were observed on the - -

4

A.      Out of a total of eight, I observed five signs of impairment.

Additionally, Trooper Hubert noted that signs of impairment were also observed during Appellant's performance of the "one-leg stand" test:

Q.      Did you observe any - - did you observe any clues during that . . . test?

A.      Yes.  Out of the four clues, I observed two: sways and used arms for balance.

Trooper Hubert also offered his opinion as to the meaning of these test results in the context of Appellant's behavior and appearance at the scene:

Q.      Are these tests, are they pass/fail[?]  I've heard that before.  Are they pass/fail tests?

A.      . . . You know, the tests are not pass or fail.  The tests are administered so that the officer can observe signs of intoxication, or impairment.  I'm sorry.

. . . .

Q.      And did you reach an opinion then at that point in time upon conducting all those tests?

A.      From what I observed through all those tests and - - and everything else, the defendant was placed under arrest for suspicion of driving while intoxicated at that time.

. . . .

Q.      So in your opinion then when you arrested him, did Mr. Lantrip have the normal use of his mental or physical faculties?

A.      He did not.

Trooper Hubert further testified that Appellant became increasingly belligerent after his arrest. Finally, he stated that he found two empty coolers in the bed of Appellant's truck.

On cross examination, Appellant challenged Trooper Hubert's knowledge of the relevant scientific literature surrounding standardized field sobriety tests.  Appellant questioned him regarding training manuals showing a lower accuracy in determining blood alcohol concentration than the study relied upon by him.  Appellant attempted to show that other factors, such as minor irregularities in the testing, a hamstring injury, and nervousness, could have caused Appellant's performance on the tests.

5

In the State's closing arguments, the prosecutor focused on the three standardized field sobriety tests and the correlation between test results and blood alcohol concentration. The prosecutor also emphasized that the results for the three tests, when combined, provided an even more accurate indicator of blood alcohol concentration. Appellant argued that minor irregularities in the administration of the tests, such as the fact that the tests were performed on ground with a mild slope, invalidated the results. He also challenged their statistical accuracy and argued that factors such as nervousness could cause poor performance on the tests.[3]

The record before us shows that Trooper Hubert's complained of testimony regarding the correlation between Appellant's performance during the "one-leg stand" test and blood alcohol concentration was significantly outweighed by other evidence of intoxication. Evidence of Appellant's performance on the three standardized field sobriety tests, and the testimony correlating performance on the other two field sobriety tests to a blood alcohol concentration level, was powerful evidence having a similar nature and probative value as the complained of testimony. Trooper Hubert testified, without objection, that "if you observe more than four clues [during the 'horizontal gaze nystagmus' test], then it's an eighty-eight percent chance that the subject's BAC is going to be above 0.08." He recounted that Appellant exhibited a total of six clues during that test, the maximum that can be observed. Trooper Hubert further testified, again without objection, that observation of "[t]wo or more clues [during the 'walk-and-turn' test], according to the study, indicates that a person's BAC will be above a .08." He stated that Appellant exhibited five clues out of a possible total of eight. In summary, Trooper Hubert testified that "[f]rom what [he] observed through all those tests and - - and everything else," he formed the opinion that Appellant did not have the normal use of his mental or physical faculties. Considering the aforementioned evidence in light of the whole record, including Appellant's actions and appearance, we conclude that the unchallenged trial evidence significantly outweighs any potential harm caused by the complained of testimony. As such, we have more than a fair assurance that the error did not influence the jury

---

[3] Appellant argued as follows:

So all you have is one witness' opinion based upon some standardized field sobriety tests that, in the best cases, are only eighty-eight percent correct. That means out of a hundred cases, twelve innocent people would have been convicted if they had relied on those tests. That's twelve too many.

6

or had but a slight effect on its verdict. Therefore, even though we have assumed error, Appellant has not established the level of harm necessary to require reversal. *See **Smith v. State***, 65 S.W.3d 332, 345-48 (Tex. App.–Waco 2001, no pet.) (reaching a similar conclusion); *see also **Coleman v. State***, 188 S.W.3d 708, 728 (Tex. App.–Tyler 2005, pet. ref'd) ("[T]he overwhelming nature of the evidence against Appellant outweighs the prejudice from the admission of the cocaine."). We overrule Appellant's sole issue.

### DISPOSITION

We *affirm* the trial court's judgment.

    BRIAN HOYLE    
Justice

Opinion delivered September 23, 2009.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*

(DO NOT PUBLISH)