NO. 12-08-00432-CR



IN THE COURT OF APPEALS
 


TWELFTH COURT OF APPEALS DISTRICT



TYLER, TEXAS


WILLIAM THOMAS LANTRIP JR.,
§
 APPEAL FROM THE THIRD

APPELLANT


V.
§
 JUDICIAL DISTRICT COURT OF


THE STATE OF TEXAS,

APPELLEE
§
 ANDERSON COUNTY, TEXAS

 

MEMORANDUM OPINION


 Appellant William Thomas Lantrip Jr. was convicted of driving while intoxicated. In his sole
issue, Appellant claims that the trial court reversibly erred by allowing improper expert testimony. 
We affirm.


Background

 Appellant was charged by indictment with driving while intoxicated. As charged, the offense
constituted a third degree felony. Appellant pleaded not guilty and, following a jury trial, the jury
found Appellant guilty of the charged offense. Appellant pleaded true to two enhancement
paragraphs. The trial court assessed Appellant's punishment at imprisonment for forty-five years. 
This appeal followed.


Expert Testimony

 In his sole issue, Appellant argues that the trial court reversibly erred by allowing improper
expert testimony from Trooper Lynn Hubert of the Texas Highway Patrol. Appellant asserts that the
trial court should have sustained his objection to the State's attempt to elicit expert testimony from
Trooper Hubert regarding the correlation between performance on the"one-leg stand" standardized
field sobriety test and blood alcohol concentration. Trooper Hubert was allowed to testify that "the
studies show" that a person who exhibits two or more standardized signs of impairment will have
a blood alcohol concentration (BAC) above 0.08. We have assumed, without deciding, that the trial
court should not have allowed the testimony in question. Cf. Emerson v. State, 880 S.W.2d 759,
768-69 (Tex. Crim. App. 1994) (addressing the proper scope of testimony relating to another
standardized field sobriety test).

Standard of Review

 The erroneous admission of Trooper Hubert's expert testimony was nonconstitutional error.
See Fowler v. State, 958 S.W.2d 853, 866 (Tex. App.-Waco 1997), aff'd, 991 S.W.2d 258 (Tex.
Crim. App. 1999). Nonconstitutional error that does not affect the substantial rights of the defendant
must be disregarded. Tex. R. App. P. 44.2(b). Substantial rights are not affected by the erroneous
admission of evidence if the appellate court, after examining the record as a whole, has fair assurance
that the error did not influence the jury, or had but a slight effect. Motilla v. State, 78 S.W.3d 352,
355 (Tex. Crim. App. 2002). In conducting a harm analysis, an appellate court should consider
everything in the record, including any testimony or physical evidence admitted for the jury's
consideration, the trial court's instructions to the jury, the state's theory, any defensive theories,
closing arguments, and even voir dire if material to the appellant's claim. Motilla, 78 S.W.3d at
355-56; Morales v. State, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000). Other factors to be
considered are the nature of the evidence supporting the verdict, the character of the alleged error,
and how the evidence might be considered in connection with the other evidence in the case. 
Motilla, 78 S.W.3d at 355; Morales, 32 S.W.3d at 867. Whether the state emphasized the error can
also be a factor. Motilla, 78 S.W.3d at 356.

Discussion

 The State presented one witness, Trooper Hubert, at the guilt/innocence stage of trial.
Appellant did not testify and brought no witnesses on his behalf. (1) Trooper Hubert testified that he
had served in the Texas Highway Patrol for six years and that he was an advanced level certified
peace officer. He also discussed his training at the state trooper academy and his routine training
after his graduation from the academy. This included a discussion of his training in the detection
of intoxication and the administration of three standardized field sobriety tests. He stated that, as
a result of his training, he had reached certified practitioner status in the administration of these three
tests.

 Trooper Hubert testified that he stopped Appellant for driving at a speed of ninety-one miles
per hour in a fifty-five miles per hour speed zone. When Appellant got out of his vehicle, he
accidentally left the driver's door open. Appellant failed to bring his driver's license with him when
he stepped out of his vehicle and had to return to the vehicle to retrieve it. Appellant's eyes were
"extremely red and bloodshot" and he smelled of alcohol. During Trooper Hubert's initial
questioning of him, Appellant would not "directly face" Trooper Hubert. Trooper Hubert asked
Appellant "if he had been drinking." Appellant replied, "I've had a few, yes, sir." Appellant
subsequently attempted to limit this statement by indicating that had consumed "a couple"
unspecified alcoholic beverages.

 Trooper Hubert explained that he administered the three standardized field sobriety tests to
Appellant. He denominated these tests as the "horizontal gaze nystagmus" test, the "walk-and-turn"
test, and the "one-leg stand" test. (2) He testified as follows regarding the "horizontal gaze nystagmus"
(HGN) test:


Q. So when we're talking horizontal gaze nystagmus then, we're looking - - what are you
looking for?


A. The horizontal gaze nystagmus is - - is the involuntary jerking of the eye as they gaze to the
side.


. . . .


Q. And what is the purpose then or why are we looking at HGN when we're talking about
intoxicated drivers?


A. Through the studies that have been done, the HGN is one of the more reliable sources or tests
that we administer on the side of the road as far as determining whether an individual is
intoxicated or not.


Q. Does alcohol affect your nystagmus?


A. Yes, it does.


. . . .


Q. Is there what's called a decision point in this?


A. According to the studies that have been performed, if you observe more than four clues
[standardized signs of impairment], then it's an eighty-eight percent chance that the subject's
BAC is going to be above 0.08. So the deciding factor is four or more.


. . . .


Q. And so did you conduct the HGN then on Mr. Lantrip?


A. Yes, I did.


. . . .


Q. Okay. So how many clues did he have?


A. A total of six.


Q. And how many were the maximum?


A. Six. Six clues is all that can be observed.



 Similarly, Trooper Hubert testified as follows regarding the "walk-and-turn" test:


Q. And then how many clues are total on this test[?] 


. . . .


A. There's a total of eight clues in the walk-and-turn test.


. . . .


Q. And is there a decision point on this test?


A. Two or more clues, according to the study, indicates that a person's BAC will be above a .08.


. . . .


Q. And then did he then try to perform the test?


A. Yes, there were clues of impairment observed.


Q. Okay. How many clues were observed on the - -


A. Out of a total of eight, I observed five signs of impairment.



Additionally, Trooper Hubert noted that signs of impairment were also observed during Appellant's
performance of the "one-leg stand" test:


Q. Did you observe any - - did you observe any clues during that . . . test?


A. Yes. Out of the four clues, I observed two: sways and used arms for balance.



 Trooper Hubert also offered his opinion as to the meaning of these test results in the context
of Appellant's behavior and appearance at the scene:


Q. Are these tests, are they pass/fail[?] I've heard that before. Are they pass/fail tests?


A. . . . You know, the tests are not pass or fail. The tests are administered so that the officer can
observe signs of intoxication, or impairment. I'm sorry.


. . . .


Q. And did you reach an opinion then at that point in time upon conducting all those tests?


A. From what I observed through all those tests and - - and everything else, the defendant was
placed under arrest for suspicion of driving while intoxicated at that time.


. . . .


Q. So in your opinion then when you arrested him, did Mr. Lantrip have the normal use of his
mental or physical faculties?


A. He did not.



Trooper Hubert further testified that Appellant became increasingly belligerent after his arrest. 
Finally, he stated that he found two empty coolers in the bed of Appellant's truck.

 On cross examination, Appellant challenged Trooper Hubert's knowledge of the relevant
scientific literature surrounding standardized field sobriety tests. Appellant questioned him
regarding training manuals showing a lower accuracy in determining blood alcohol concentration
than the study relied upon by him. Appellant attempted to show that other factors, such as minor
irregularities in the testing, a hamstring injury, and nervousness, could have caused Appellant's
performance on the tests.

 In the State's closing arguments, the prosecutor focused on the three standardized field
sobriety tests and the correlation between test results and blood alcohol concentration. The
prosecutor also emphasized that the results for the three tests, when combined, provided an even
more accurate indicator of blood alcohol concentration. Appellant argued that minor irregularities
in the administration of the tests, such as the fact that the tests were performed on ground with a mild
slope, invalidated the results. He also challenged their statistical accuracy and argued that factors
such as nervousness could cause poor performance on the tests. (3)

 The record before us shows that Trooper Hubert's complained of testimony regarding the
correlation between Appellant's performance during the "one-leg stand" test and blood alcohol
concentration was significantly outweighed by other evidence of intoxication. Evidence of
Appellant's performance on the three standardized field sobriety tests, and the testimony correlating
performance on the other two field sobriety tests to a blood alcohol concentration level, was
powerful evidence having a similar nature and probative value as the complained of testimony. 
Trooper Hubert testified, without objection, that "if you observe more than four clues [during the
'horizontal gaze nystagmus' test], then it's an eighty-eight percent chance that the subject's BAC is
going to be above 0.08." He recounted that Appellant exhibited a total of six clues during that test,
the maximum that can be observed. Trooper Hubert further testified, again without objection, that
observation of "[t]wo or more clues [during the 'walk-and-turn' test], according to the study,
indicates that a person's BAC will be above a .08." He stated that Appellant exhibited five clues out
of a possible total of eight. In summary, Trooper Hubert testified that "[f]rom what [he] observed
through all those tests and - - and everything else," he formed the opinion that Appellant did not have
the normal use of his mental or physical faculties. Considering the aforementioned evidence in light
of the whole record, including Appellant's actions and appearance, we conclude that the
unchallenged trial evidence significantly outweighs any potential harm caused by the complained
of testimony. As such, we have more than a fair assurance that the error did not influence the jury
or had but a slight effect on its verdict. Therefore, even though we have assumed error, Appellant
has not established the level of harm necessary to require reversal. See Smith v. State, 65 S.W.3d
332, 345-48 (Tex. App.-Waco 2001, no pet.) (reaching a similar conclusion); see also Coleman v.
State, 188 S.W.3d 708, 728 (Tex. App.-Tyler 2005, pet. ref'd) ("[T]he overwhelming nature of the
evidence against Appellant outweighs the prejudice from the admission of the cocaine."). We
overrule Appellant's sole issue.


Disposition

 We affirm the trial court's judgment.




 BRIAN HOYLE 

 Justice



Opinion delivered September 23, 2009.

Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.


















(DO NOT PUBLISH)
1. The complained of testimony by Trooper Hubert had not been previously alluded to by either party during
voir dire or opening statements. 
2. A basic description of these three tests can be found in Smith v. State
, 65 S.W.3d 332, 343 n.2, 344 n.3,
345 n.5, 346 nn.6-8 (Tex. App.-Waco 2001, no pet.).
3. Appellant argued as follows:


So all you have is one witness' opinion based upon some standardized field sobriety tests that, in
the best cases, are only eighty-eight percent correct. That means out of a hundred cases, twelve
innocent people would have been convicted if they had relied on those tests. That's twelve too
many.