# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-18-00567-CR

---

**Ricky Lee Murray, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 20TH DISTRICT COURT OF MILAM COUNTY
### NO. CR25,509, THE HONORABLE JOHN YOUNGBLOOD, JUDGE PRESIDING

---

### O P I N I O N

Ricky Lee Murray was convicted by a jury of sexual assault for intentionally or knowingly causing the penetration of the complainant's female sexual organ without her consent. *See* Tex. Penal Code § 22.011(a)(1)(A). The trial court sentenced Murray to twelve years in prison and entered a conforming judgment. In four issues, Murray contends that the trial court should have excluded testimony from two Sexual Assault Nurse Examiners ("SANE"s). We affirm.

### BACKGROUND

Murray was indicted for sexual assault for digitally penetrating Samantha Tolleson's sexual organ without her consent. Tolleson died before the trial. At trial, the State presented testimony from several witnesses at the RV park in Rockdale, where the charged conduct took place; the lead investigator in the case; and two SANEs.

The evidence at trial established that on March 17, 2017, Samantha Tolleson was living in the RV park, and Murray was one of her neighbors. During the day she borrowed a phone

from Murray and was coherent, could form words, and did not seem intoxicated. Later that afternoon, Murray went by himself to retrieve his phone. That evening, Rockdale police responded to a call from the RV park and arrived at Tolleson's RV. The manager of the RV park, Billie LeFevre, also arrived at the scene. According to LeFevre's testimony, Murray had called her and told her that Tolleson had fallen on the floor in her RV. As LeFevre and Murray entered the RV, Tolleson remained inside and looked scared. LeFevre testified that she and Murray helped Tolleson to the couch, that Tolleson was not saying "any words that [LeFevre] could recognize" and was speaking in "gibberish," that she noticed water on the floor and a pill bottle on a table next to Tolleson, and that Tolleson was wearing a long white t-shirt and no pants. LeFevre retrieved some pants for Tolleson, but she grabbed LeFevre, mumbled some more at her, and would not let LeFevre help her put on the pants. Tolleson was taken to the hospital for a suspected Benadryl overdose.

Tolleson stayed in the hospital for several days. Two days after she was admitted, ER nurse and certified SANE Jennifer Midgette conducted a SANE exam. At trial, Midgette told the jury that when she examined Tolleson, she first took a patient history, as she would do with any other patient. This included asking Tolleson about her allergies, medications, and last menstrual cycle. Midgette testified that she needed the history "for diagnosis and treatment"—it was her "map" for what she "need[ed] to look for and . . . address." According to Midgette's examination notes, which were admitted over Murray's Confrontation Clause objection, Tolleson told Midgette that Murray had sexually assaulted her. In addition, the examination notes said:

> [Nurse] asked [patient] what was her concern today? [Patient] states "I was raped" . . . "[Murray] was knocking on the door" . . . "He comes in the house" . . . "He made me a drink with a foil pack.["] [Patient] continues "I said I need to go to the bathroom so I can throw up" . . . "He said ['] no stay here.['] He was holding me

2

back." . . . He was sitting on the love seat and said ["]sit next to me". [Patient] states "He said ['aww Sam[,'] and he kisses me and starts rubbing me on the outside of my clothes." [Patient] clarifies "he used the three fingers (held up her index finger, middle finger, and ring finger) to touch my clit area in a circular[-]type motion." [Patient] states "I pushed him away[,] and he did it again inside my panties" . . . "I hit him on his right cheek." . . . "He gave me this really mad look." [Nurse] asks "Then what happened?" [Patient] states "It kinda blacks out" . . . [Murray] was at my house from between 1 & 2 and 6:30pm" . . . "my jeans and panties were around my ankles when [LeFevre] got there." [Patient] states ["]He took my knife[,] and he checked the guns."

(Ellipses in original.) Tolleson also explained to Midgette that what Murray did hurt her. Midgette considered what Tolleson relayed to her to be an instance of "digital penetration."

After taking the history, Midgette then did a head-to-toe assessment, looking over Tolleson's entire body and documenting any injuries. Midgette did so "to know what kind of trauma to address as a nurse[,] and also there may be forensic evidence." Midgette noted 12 injuries: a painful, purple, "fairly new" bruise to Tolleson's head; a couple of bruises on her arm; and many more "fairly recent" bruises "at the knee or below." These injuries, according to Midgette's testimony at trial, were consistent with Tolleson's account of trying to get up and go to the bathroom but Murray "pull[ing] her back."

Midgette did not see any genital injuries, but she did collect two pairs of underwear from Tolleson that both had similar blood staining. One pair was what Tolleson came to the hospital with, and the other was gauze underwear that the hospital issued to her. Midgette said that the blood could have resulted from either Tolleson's menstrual cycle or genital trauma. Tolleson told Midgette, however, that her last cycle was during the first of March. The assault and the SANE exam happened on March 17 and 19, respectively, suggesting to Midgette that the blood resulted from trauma. Midgette testified that injuries like Tolleson's could suggest either consensual sexual contact or non-consensual sexual contact.

3

Another SANE, Deborah Kleypas, reviewed the records of Midgette's work and testified at trial about her review, over another defense Confrontation Clause objection. Like Midgette, Kleypas testified that the blood in the gauze underwear suggested that there was an injury that was bleeding, rather than menstruation. Kleypas also told the jury that Tolleson's injuries were consistent with both consensual sexual contact and non-consensual sexual contact.

Before speaking with law enforcement, Murray called a friend and told him that she "was hollering . . . when she came into the hospital" about having been raped. Murray denied sexually assaulting Tolleson and said that he went to check on her and that, when he saw that she was unresponsive, he "kind of panicked[,] and that's when he went and got" LeFevre. Subsequently, Sergeant Jody Tillery of the Rockdale Police Department investigated the March 17 incident in Tolleson's RV. Sergeant Tillery spoke with Tolleson, contacted hospital personnel, and reviewed the SANE exam records. Then Sergeant Tillery contacted Murray and took his statement. Murray said several times that he never had any sort of physical contact with Tolleson, admitting to only one "side hug" ever with her. Murray also gave Sergeant Tillery conflicting accounts of going to Tolleson's RV on the day of the assault: "he had said first he only went one time," but "[t]he next time it was more than once."

A Department of Public Safety ("DPS") investigator conducted a second, video-recorded interview of Murray, entered in evidence at trial. During the second interview, Murray first told the investigator that "nothing ever happened between" him and Tolleson but later said that, four days before the assault, he "grabbed [her] ass" when she hugged him. As for what happened on March 17 in Tolleson's RV, Murray gave the investigator a new account, describing the encounter as locking eyes and then kissing. Murray said that he started rubbing her vagina outside her underwear and that he did so for about a minute before she told him to stop. He said

4

that he touched her breasts too. He admitted that it was possible that his fingers went inside her vagina while he was rubbing her. The investigator asked Murray whether he tried to force himself on her while "she could barely stand up, couldn't talk, and didn't know what she was doing." Murray responded that "anything is possible." And he agreed that she "wasn't coherent," "was pretty wasted," and "kept falling off the couch" while he was in her RV.

Murray testified and said that he was unsure if he had penetrated Tolleson because he was "rubbing her pretty good." He also testified on direct examination that she was coherent while he was in her RV but, on cross-examination, admitted that what he told the DPS investigator was the truth—Tolleson was not coherent.

The jury found Murray guilty. The trial court sentenced him to 12 years in prison, and this appeal followed.

## DISCUSSION

### I. SANEs' testimony was admissible under Rule of Evidence 702

In his first and second issues, Murray challenges the trial court's admission of Midgette's and Kleypas's expert testimony under Rule of Evidence 702. We review the admission of expert testimony for an abuse of discretion. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011); *Russeau v. State*, 171 S.W.3d 871, 881 (Tex. Crim. App. 2005). A trial court does not abuse its discretion if its ruling is within the "zone of reasonable disagreement." *Tillman*, 354 S.W.3d at 435. We consider the trial court's ruling against the backdrop of what was before the trial court when it made the ruling. *Billodeau v. State*, 277 S.W.3d 34, 39 (Tex. Crim. App. 2009).

Rule 702 conditions the admission of testimony by a qualified expert witness on whether "the expert's scientific, technical, or other specialized knowledge will help the trier of fact

5

to understand the evidence or to determine a fact in issue." Thus, the proponent of expert testimony must prove that (1) the expert is qualified as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will actually assist the factfinder in deciding the case. *Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006). These requirements—commonly referred to as (1) qualification, (2) reliability, and (3) relevance—raise distinct questions that must be evaluated independently. *Id.* Here, Murray challenges the relevancy of the expert testimony of Midgette and Kleypas on the issue of consent.[1]

As an initial matter, to the extent that Murray suggests that the entirety of Midgette's and Kleypas's testimony should have been excluded because it was not relevant to the disputed issue of consent, we note that their testimony was not limited to this issue. Penetration, an element of the offense charged by the State, was also in dispute. In fact, Murray's counsel recognized this in his opening statement:

> And what you will see is the evidence shows[] that [Murray]'s statement, even to the police[,] says he's not sure if he actually penetrated her or not. Her statement to the SANE nurse, she's not clear whether he actually penetrated her or not. And I want to remind you that the law that you have to follow in this case, there has to be penetration. So that in and of itself, there is reasonable doubt in this case.

---

[1] In two issues, Murray asserts that the testimony fails to satisfy either prong of the relevance inquiry. *See Tillman v. State*, 354 S.W.3d 425, 438 (Tex. Crim. App. 2011) (stating that "the relevance inquiry is whether the expert testimony will assist the trier of fact and is sufficiently tied to the facts of the case" (internal quotation omitted)). In his first issue, Murray contends that Midgette's and Kleypas's testimony "did not assist the jury in understanding the evidence or a fact in issue." In his second issue, Murray contends that "the State failed to show that the [the expert testimony] was applied or connected to the facts of [Murray]'s case." In both issues, Murray asserts that he admitted, and therefore there was no dispute at trial, that he and Tolleson had sexual contact. Therefore, in Murray's view, the "operative issue" for the jury to decide was whether the contact was consensual.

Both Midgette's and Kleypas's testimony bore on the penetration element. They testified about their qualifications and experience as SANEs as well as the anatomy of the female sexual organ. They also explained what "penetration" means by reference to anatomical structures and testified that Tolleson's description of Murray's rubbing her clitoris would constitute a penetration because it requires a touching beyond the labia minora.

Second, to the extent Murray challenges the portions of Midgette's and Kleypas's testimony that bore on the issue of consent, we conclude that their testimony on this issue was relevant. The relevance inquiry is whether the expert testimony will assist the trier of fact and is sufficiently tied to the facts of the case. *Tillman*, 354 S.W.3d at 438. A trial court may admit expert testimony "when the general subject matter is within the comprehension of the average juror, as long as the witness has some specialized knowledge on the topic that will 'assist' the jury." *Id.* (quoting *Coble v. State*, 330 S.W.3d 253, 288 (Tex. Crim. App. 2010)). "Thus, '[t]he question under Rule 702 is not whether the jurors know something about this subject, but whether the expert can expand their understanding in a relevant way.'" *Id.* (quoting *Coble*, 330 S.W.3d at 288). In addition, expert testimony is sufficiently tied to the facts of a case when its "[takes] into account enough of the pertinent facts to be of assistance to the trier of fact on a fact in issue." *Id.* (quoting *Jordan v. State*, 928 S.W.2d 550, 556 (Tex. Crim. App. 1996)).

Midgette and Kleypas testified about the blood stains in the two pairs of Tolleson's underwear. They testified that the blood could have come from either her menstrual cycle or a traumatic event, but they later excluded her cycle as a possible cause based on Tolleson's statements during the exam, leaving only trauma. Finally, Midgette and Kleypas explained to the jury, based on their specialized knowledge, why the blood stains suggested that a traumatic event had happened to Tolleson. *See Owens v. State*, 381 S.W.3d 696, 705–06 (Tex. App.—

Texarkana 2012, no pet.) (holding admission of SANE's expert testimony not to have been abuse of discretion because testimony assisted jury because it helped explain other witnesses' testimony and helped explain physical evidence about complainant's body). Midgette developed the facts underlying her testimony by conducting an exam in accordance with her training and experience, and both Midgette and Kleypas interpreted those facts through the prism of their qualifications and experience.

The record shows that Midgette's and Kleypas's testimony assisted the jury and was sufficiently connected to the facts of the case on the issue of whether the sexual contact between Murray and Tolleson was consensual. *See Tillman*, 354 S.W.3d at 441; *Nations v. State*, 944 S.W.2d 795, 798–99 (Tex. App.—Austin 1997, pet. ref'd). We hold the trial court did not abuse its discretion in overruling Murray's relevancy objections to the testimony of Midgette and Kleypas.

We overrule Murray's first and second issues.[2]

## II. Murray failed to preserve a hearsay complaint about the SANEs' testimony.

In his third issue, Murray contends that "the trial court erred in [not] excluding expert testimony that was no more than a conduit for inadmissible hearsay." He argues that Tolleson's statements during the SANE exam "are testimonial and should not have been allowed to come in through either Kleypas or Midgette." He also argues that her statements were testimonial

---

[2] Although not raised as a separate issue, Murray also argues that "the testimony by Kleypas and Midgette was no more than the State attempting to bolster [Tolleson]'s credibility about whether the sexual contact was consensual." Murray does not cite any authority to support this argument and, thus, has waived this issue. *See* Tex. R. App. P. 38.1(i).

under *Crawford v. Washington*, 541 U.S. 36 (2004), and other Confrontation Clause precedents, but we will address that contention below, under his fourth issue.

To preserve a complaint for appellate review, the record must show that the complaint was made to the trial court in a manner that "stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." Tex. R. App. P. 33.1(a)(1)(A). "The point of error on appeal must comport with the objection made at trial." *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012). A hearsay objection generally does not preserve a Confrontation Clause complaint for appeal. *See Golliday v. State*, 560 S.W.3d 664, 671 (Tex. Crim. App. 2018); *Holland v. State*, 802 S.W.2d 696, 700 (Tex. Crim. App. 1991); *Bunton v. State*, 136 S.W.3d 355, 368 (Tex. App.—Austin 2004, pet. ref'd). It therefore stands to reason that a Confrontation Clause objection generally does not preserve for appeal a complaint that the trial court erred in admitting hearsay.

The State argues that Murray failed to make a hearsay objection to Tolleson's statements made during the SANE exam, and Murray does not direct us to any such request, objection, or motion in the record. Although the record shows that Murray objected to the admission of Midgette's examination notes and of Tolleson's statements on the ground that the testimony violates the Confrontation Clause, and the trial court overruled that objection, nothing in the record reveals that Murray objected to the examination notes or to Tolleson's statements as hearsay. We therefore hold that Murray did not preserve error on his complaint that Tolleson's statements to Midgette constitute inadmissible hearsay. *See* Tex. R. App. P. 33.1(a)(1)(A); *Golliday*, 560 S.W.3d at 671; *Holland*, 802 S.W.2d at 700; *Bunton*, 136 S.W.3d at 368. As a result, we overrule his third issue.

9

**III.    Tolleson's statements to Midgette during the exam were not "testimonial" under the Confrontation Clause.**

In his fourth issue, Murray contends that "the trial court erred by allowing the expert to testify to statements about the assault in violation of the Confrontation Clause." He argues that Tolleson's statements during the exam were inadmissible because they were "testimonial" statements by a declarant whom he did not have a chance to cross-examine, under *Crawford* and *Langham v. State*, 305 S.W.3d 568 (Tex. Crim. App. 2010). In support of his argument, he points out that the exam took place two days after Tolleson was admitted to the hospital, suggesting the lack of any emergency medical need for the exam, and that Tolleson was admitted because of a suspected Benadryl overdose instead of as a result of potential injuries from a sexual assault.

The Confrontation Clause of the Sixth Amendment states that "[i]n all criminal prosecutions . . . the accused shall enjoy the right . . . to be confronted with the witnesses against him." "In accordance with this constitutional right, out-of-court statements offered against the accused that are 'testimonial' in nature are objectionable unless the prosecution can show that the out-of-court declarant is presently unavailable to testify in court and the accused had a prior opportunity to cross-examine him." *Langham*, 305 S.W.3d at 575–76 (citing *Crawford*, 541 U.S. at 59, 68). There are (at least)

"three kinds of [out-of-court] statements that could be regarded as testimonial:"

- ex parte in-court testimony or its functional equivalent—that is, materials such as affidavits, custodial examinations, prior testimony that the accused was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially;

- extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; and

10

- statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Id.* at 576 (quoting *Wall v. State*, 184 S.W.3d 730, 735–36 (Tex. Crim. App. 2006) (quoting *Crawford*, 541 U.S. at 51–52)).

Whether an out-of-court statement is testimonial is a question of law. *Id.* "Although we defer to the trial court's resolution of credibility issues and historical fact, we review *de novo* the ultimate constitutional question of whether the facts as determined by the trial court establish that an out-of-court statement is testimonial." *Id.* "In making that judgment, we look to determine whether 'the surrounding circumstances objectively indicate that the primary purpose of the interview or interrogation is to establish or prove past events potentially relevant to later criminal prosecution.'" *Id.* (quoting *De La Paz v. State*, 273 S.W.3d 671, 680 (Tex. Crim. App. 2008)). The "primary purpose" is the "'first in importance' among multiple, potentially competing purposes" for an interview. *Id.* at 579 (citing *Davis v. Washington*, 547 U.S. 813, 826–32 (2006)).

Medical reports created for treatment purposes generally are non-testimonial. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 312 n.2 (2009); *Berkley v. State*, 298 S.W.3d 712, 715 (Tex. App.—San Antonio 2009, pet. ref'd). "A statement is more likely to be testimonial if the person who heard, recorded, and produced the out-of-court statement at trial is a government officer." *Davis v. State*, 169 S.W.3d 660, 667 (Tex. App.—Austin 2005), *aff'd*, 203 S.W.3d 845 (Tex. Crim. App. 2006). By contrast, "statements to individuals who are not law enforcement officers . . . are much less likely to be testimonial." *Ohio v. Clark*, 135 S. Ct. 2173, 2181 (2015).

Midgette described for the jury the "two primary purposes of a SANE exam": "diagnosis and treatment." She explained to the jury that, "[a]s with any other patient," she took a

11

patient history from Tolleson, including asking about her allergies, medications, and last menstrual cycle. Midgette testified that she needed the history "for diagnosis and treatment," to guide what she "need[ed] to look for and . . . address." After taking the history, Midgette then did the "head-to-toe assessment," "looking over [Tolleson's] entire body and documenting any injuries." She did so "to know what kind of trauma to address as a nurse[,] and also there may be forensic evidence." Midgette's testimony establishes that the primary purpose of Tolleson's statements during the patient history was for medical treatment, making the statements non-testimonial. *See Melendez-Diaz*, 557 U.S. at 312 n.2; *Langham*, 305 S.W.3d at 576; *Berkley*, 298 S.W.3d at 715.

To support his argument that the statements were instead testimonial, Murray points to (1) Tolleson's identifying him as her assailant, (2) her signing a release that the records could be sent to the police, (3) the fact that Kleypas has testified in many prosecutions because of her role as a SANE, and (4) the fact that the SANE exam was not for emergency medical treatment. None of these factors dissuade us from concluding that the SANE exam was for the primary purpose of medical treatment.

When she identified Murray, Tolleson was responding to Midgette's question, "what was her concern today?" According to Midgette's notes about Tolleson's statements: "[Nurse] asked [patient] what was her concern today? [Patient] states 'I was raped' . . . '[Murray] was knocking on the door' . . . 'He comes in the house' . . . 'He made me a drink with a foil pack,'" and Murray "'used the three fingers (held up her index finger, middle finger, and ring finger) to touch my clit area in a circular[-]type motion.' [Patient] states 'I pushed him away[,] and he did it again inside my panties.'" (Ellipses in original.) Midgette's simple question does not "objectively indicate that the primary purpose of the interview . . . [wa]s to establish or prove past events potentially relevant to later criminal prosecution." *See Langham*, 305 S.W.3d at 576.

Instead, it is more consistent with Midgette's stated goal of learning what happened to Tolleson so she could diagnose and treat her.

So too with the records release. Tolleson's ability to control release of the records from the exam suggests that medical treatment was the exam's primary purpose. Were a patient to refuse to release the records to the police, it would make little sense to think of the records as therefore purposeless. The records, though unavailable to police, would still serve the purpose of documenting the medical treatment provided. Nor does the record anywhere reflect that Midgette's taking of Tolleson's history depended on, or even followed in time, Tolleson's signing the release.

Kleypas's experience testifying as an expert witness because of her role as a SANE also does not change the reasons that Midgette gave as underpinning the exam. The exam was for the primary purpose of medical treatment despite Kleypas's background. *See United States v. Barker*, 820 F.3d 167, 172 (5th Cir. 2016) ("LaFrance's SANE certification did not convert the essential purpose of her conversation with A.M. from medical evaluation and treatment to evidence-collection, though it may have tended to lead to Barker's prosecution. Like all good nurses, LaFrance would have acted with the principal purpose to provide A.M. with medical care—whether or not she possessed the SANE certification."). Murray's view would require that we take a categorical approach to patient statements during SANE exams—that they are always testimonial because the statements so often appear later in in-court testimony or exhibits. Yet Confrontation Clause precedents counsel us not to take a categorical approach to deciding what statements are testimonial. *See Clark*, 135 S. Ct. at 2181 (declining "to adopt a categorical rule excluding" "statements to individuals who are not law enforcement officers" "from the Sixth Amendment's reach"); *Wall*, 184 S.W.3d at 741–42 (rejecting "any per se or categorical approach" to determining whether excited utterances are testimonial hearsay); *Davis*, 169 S.W.3d at 667 (describing "the

grueling job of applying *Crawford* on a case-by-case basis" that "[c]ourts across the nation have been confronted with").

Finally, Murray cannot rely on the lack of a medical emergency—that the exam was conducted two days post-assault. While an emergency may often suffice to show that a statement is non-testimonial, one is not necessary. "'[T]he existence *vel non* of an ongoing emergency is not the touchstone of the testimonial inquiry.' Instead, 'whether an ongoing emergency exists is simply one factor . . . that informs the ultimate inquiry regarding the "primary purpose" of an interrogation.'" *Clark*, 135 S. Ct. at 2180 (internal citation omitted) (quoting *Michigan v. Bryant*, 562 U.S. 344, 366, 374 (2011)). As a result, although Midgette conducted the exam two days after Tolleson was admitted to the hospital, the end of any emergency does not make Midgette and Tolleson's later conversation testimonial or any less for the purpose of medical treatment. Midgette's testimony was that the exam was still for medical treatment when conducted, and the trial court did not err by relying on that testimony.

For all these reasons, we overrule Murray's fourth issue.

## CONCLUSION

We affirm the trial court's judgment.

_____

Chari L. Kelly, Justice

Before Justices Goodwin, Baker, and Kelly

Affirmed

Filed: February 27, 2020

Publish

14